Joe Vernon SEARS, an Individual, in person and for all other persons similarly situated, Plaintiffs,

v.

The ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, and United Transportation Union, a successor to Brotherhood of Railway Trainmen, a labor organization, Defendants.

Civ. A. No. W–4963.

United States District Court, D. Kansas.

June 14, 1978.

Terry G. Paup, Wichita, Kan., Hinson & Hinson, Houston, Tex., Chester Lewis, of Lewis & Davis, Wichita, Kan., for plaintiffs.

Thomas R. Conklin, J. B. Reeves, Law Dept., Topeka, Kan., Thomas J. Fitzgerald, Chicago, Ill., for Atchison, Topeka & Santa Fe Ry. Co.

Payne H. Ratner, Jr., Wichita, Kan., Charles R. Judge, William C. Maier, of Dubail, Judge, Kilker and Maier, St. Louis, Mo., for United Transp. Union.

## MEMORANDUM OF DECISION

WESLEY E. BROWN, District Judge.

### BACKGROUND

This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* [Title VII or the Act]. Plaintiffs and class members[1] charge The Atchison,

---

1. The action was initially filed by Joe Vernon Sears as a class action. The Court ordered that Criscell Kemp, A. M. Bennett, A. L. Woolfolk, T. C. Luckey, and W. W. Seymour be permitted to intervene on September 3, 1975. On December 16, 1975, the Court granted leave to intervene as named party plaintiffs to Albert L. Bennett, C. J. Skelton, Archie N. Jones, Forrest P. Tollett, John W. Landrum, Lawson C. Spencer, Thomas H. White, Earlie Nash, Aubrey A. Robinson, Edward Rawlins, John W. Cole, Charles Majors, Jr., Jessie J. Smith, Paul H. Stewart, Jimmy E. Brown, Carl E. Chester,

Topeka and Santa Fe Railway [Santa Fe] and the United Transportation Union [UTU], successor to the Brotherhood of Railway Trainmen [BRT] and the Order of Railway Conductors and Brakemen [ORC&B], with having engaged in a policy and practice of discrimination on account of race in their dealings with plaintiffs and other black train porters employed by Santa Fe, in violation of Title VII.

The plaintiffs are black male Americans who at any time were employed by Santa Fe as train porters, also known as porter-brakemen, and who have been employed by Santa Fe, in any capacity, during the period from July 2, 1965, to the present. The Brotherhood of Sleeping Car Porters [BSCP], an unincorporated labor association certified to represent train porters since April 5, 1946, is also a party plaintiff. The BSCP was merged with the "System Division" of The Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees [BRAC], effective April 1, 1978. Because of the merger, the appropriate division of BRAC is a party plaintiff, but all relevant actions were taken by the BSCP, and any judgment rendered by this Court will be as to the BSCP, subject to later action if necessary.

The defendant Santa Fe is a Delaware corporation which conducts interstate transportation by railroad. Santa Fe rail lines extend from Chicago, Illinois, west to San Francisco, California, and south to Houston, Texas.[2] At all times material, Santa Fe was organized for operating purposes into three subdivisions: Eastern Lines, operating in Illinois, Iowa, Missouri, Kansas, Oklahoma, Colorado, and New Mexico; Western Lines, operating in Kansas, Oklahoma, Texas, Louisiana, and New Mexico; and Coast Lines, operating in New Mexico, Arizona, and California.

The UTU is an unincorporated labor union consisting of an International union, local unions, and intermediate bodies. The UTU or its predecessors, BRT and ORC&B, are and have been the certified bargaining representatives for brakemen and conductors since the 1920's. The BRT and ORC&B merged into the UTU, effective January 1, 1969. The UTU and its predecessors, BRT and ORC&B, have represented, in labor matters, some members of the crafts of brakemen and conductors since 1868. From 1868 until 1966 the Santa Fe was an "open shop" employer and membership in a union was not a condition of employment. Since 1966, the Santa Fe has been a "union shop" employer and membership in a union, certified to represent the employee craft by the Railway Labor Act, 45 U.S.C. § 151 et seq., is required within thirty days of employment. The parties have stipulated that the UTU is capable of being sued and is properly being sued in this action.

Plaintiff Joe Vernon Sears filed a Complaint against Santa Fe and UTU with the Kansas Commission on Civil Rights [KCCR] on March 8, 1966, alleging that Santa Fe and UTU had denied and were denying him and other Santa Fe train porters their rights under Title VII by reason of race. Sears filed a Complaint with the Equal Employment Opportunity Commission [EEOC] on October 4, 1966, setting forth the same charges as brought before the KCCR, and the EEOC asserted jurisdiction over Sears' complaint. On October 7, 1972, Sears was notified by the EEOC that he was entitled to file suit against defendants under Title VII. Several other plaintiffs also filed Complaints with the EEOC and were notified of their right to sue. The parties have stipulated that the jurisdictional requirements to bring suit under Title VII have been satisfied by plaintiffs and class members, and that venue is proper in this district.

On August 4, 1975, the Court entered an Order pursuant to Rule 23, Fed.R.Civ.P.,

Raymond Wiley, Elgie Crow, Ellis Johnson, and Ray E. Landrum.

2. For the purposes and issues herein, the Gulf, Colorado and Santa Fe Railroad Company and the Panhandle and Santa Fe Railroad Company, both separate corporations, were part of the Santa Fe. Both of these corporations were merged into the Santa Fe on August 1, 1965.

that this action is maintainable as a class action under Rule 23(b)(2), on behalf of a class composed of the plaintiffs and all other black train porters employed by Santa Fe, in any capacity, during the period from July 2, 1965, to the present. Thereafter, on September 8, 1976, the Court, following notice to all class members, entered an Order Approving Compromise and Dismissal of Back Pay and Attorneys' Fees Claim Against Defendant Santa Fe, with respect to plaintiffs and class members except Criscell Kemp, A. M. Bennett, A. L. Woolfolk, T. C. Luckey, and W. W. Seymour. On December 29, 1976, January 3, 1977, and January 4, 1977, plaintiffs Kemp, Bennett, Woolfolk, Luckey, and Seymour each entered into Covenants Not to Sue with Santa Fe, and compromised and dismissed their respective back pay and attorneys' fees claims against Santa Fe. As a result, all plaintiffs and class members have compromised and settled their back pay and attorneys' fees claims with defendants Santa Fe.

On January 16, 1978, the BSCP was joined as a party plaintiff. Trial of this matter was had to the Court by means of a joint presentation of stipulated facts, subject to objections of relevancy and materiality, filed February 8, 1978. In connection with this presentation, each party also filed numerous exhibits. Memorandum briefs and reply briefs were subsequently filed by each party. The record before the Court is complete. The parties are agreed that this action will be bifurcated into a liability and a damage stage, the latter to follow only if liability is found. We now turn our attention to the question of the liability of defendants.

## THE ISSUES

Plaintiffs contend that the Santa Fe, and UTU, and the UTU's predecessors have, for over three quarters of a century, engaged in a systematic campaign and practice of excluding blacks, and more particularly, black train porters, from employment as brakemen, conductors, and supervisory or management personnel with Santa Fe. Plaintiffs claim that they have suffered disparate treatment because Santa Fe denied employment opportunity to blacks by employing and retaining blacks in the traditionally Negro crafts of train porter and chair car attendant. Plaintiffs also claim that the seniority systems for the relevant crafts, entered into and maintained through collective bargaining agreements between Santa Fe and the BRT and ORC&B, have had a discriminatory impact upon them by locking them into the crafts of train porter and chair car attendant. Plaintiffs contend that the result of the seniority system is to perpetuate the effects of prior discrimination, establishing a Title VII violation even though the actual discriminatory acts may have occurred before the effective date of Title VII [pre-Act]. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) [*Griggs*]. Plaintiffs contend that the seniority system is not bona fide within the meaning of *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) [*Teamsters*]. In part, plaintiffs assert that the seniority system is not bona fide under Title VII because of the defendant unions' failure to eradicate discrimination, alleging that the unions had a duty to plaintiffs to eradicate discrimination against them. Plaintiffs further contend that their rights should be governed by Title VII rather than the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, so that defendants cannot defend their conduct by asserting that such conduct was immunized by the Railway Labor Act. Plaintiffs seek equitable and injunctive relief against Santa Fe and UTU whereunder the plaintiffs and all class members are granted seniority rights as brakemen and conductors retroactive to July 2, 1965, the effective date of Title VII. In addition, plaintiffs seek to recover from the UTU, on behalf of themselves and all other class members, an award of back pay and their reasonable attorneys' fees and costs incurred herein. It is stipulated that plaintiffs have settled all damage and attorneys' fees claims with the Santa Fe.

Both Santa Fe and the UTU contend that plaintiffs have failed to make out a case of

discrimination. Defendants assert that the discriminatory conduct, if any, was in hiring plaintiffs as chair car attendants and train porters rather than as brakemen, acts which were done before the effective date of Title VII, and that under the doctrine of *United Airlines Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) [*Evans*], the effect of discriminatory hiring is not a continuing violation past the effective date of the Act. In the alternative, defendants claim that even if plaintiffs have established racial discrimination perpetuated into the period covered by Title VII by a seniority system, the seniority system is bona fide pursuant to § 703(h) of Title VII and *Teamsters*, and therefore there can be no violation of Title VII.

Santa Fe contends that it in no way discriminated against plaintiffs in violation of Title VII, either pre-Act or post-Act. The railroad asserts that under § 703(j) of the Act, it is not required to grant preferential treatment to a group because of race. Santa Fe contends that it is bound by the provisions of the Railway Labor Act. Accordingly, Santa Fe states that it must recognize, for collective bargaining purposes, the UTU and its predecessors as the union certified to represent brakemen and conductors, and the BSCP as the union certified to represent train porters and chair car attendants. Furthermore, Santa Fe contends that it is bound by decisions rendered under and in accordance with the Railway Labor Act. Santa Fe contends that it has no right to unilaterally transfer employees under the Railway Labor Act, and points out that plaintiffs' certified representative, the BSCP, objected to the alleged offering of jobs in other crafts by the Santa Fe to employees represented by the BSCP, after the effective date of the Act. Santa Fe contends that post-Act statistics offered by plaintiff are of little evidentiary value, and fail to make out a prima facie case of post-Act discrimination.

The UTU joins Santa Fe in asserting that the statistical evidence submitted by plaintiffs fails to show discrimination against the plaintiff class. On its own behalf, UTU contends that it is and its predecessors were prohibited by the Railway Labor Act from representing the plaintiff class because they were represented by the BSCP, and that the UTU had no duty to plaintiffs to attempt to eradicate alleged discrimination against them. UTU asserts that BSCP, as plaintiffs' certified bargaining representative, could have worked on plaintiffs' behalf. UTU contends that Santa Fe has exclusive hiring and promotion authority, and that the UTU is not liable or responsible for any acts Santa Fe may have done pursuant to that authority. The UTU asserts that it and its predecessors were certified to represent brakemen and conductors, and actions on behalf of these crafts were not discriminatory, but were within the framework of the Railway Labor Act.

The defendants deny that plaintiffs are entitled to relief. They contend that plaintiffs and class members, even in the absence of any discrimination, should such discrimination be found, would not have obtained better paying positions by reason of their lack of qualifications and are therefore precluded individually from receiving monetary relief. Defendants further contend, in the event that seniority is awarded plaintiffs, that the rights of white brakemen and conductors should be taken into account. The question of relief, of course, is for the second stage of this action, and is not before the Court at this time.

## THE FACTS

The stipulated facts are by reference made a part of the decision. We summarize those relevant facts which are necessary to an understanding of the views expressed herein.

The operation of trains by Santa Fe and other railroads requires the performance of braking duties. These duties include the inspection of the train cars, the testing of signals and brake apparatus for the safety of train movement, the use of hand and lamp signals for the protection and movement of trains, opening and closing switches, coupling and uncoupling cars and engines and the hose and chain attachments

thereof, the comparison of watches when required by the rules of the company, reporting to and receiving instructions from the train master, and while on duty, being under the direction of the conductor and performing such other braking duties as may be necessary.

Historically, the Santa Fe train runs include passenger trains, through freight trains, local freights, and mixed passenger and freight trains. Traditionally, the train crew on local and through freight trains consisted of a conductor, head-end brakeman, rear-end brakeman, engineer and fireman. Train porters were not employed on freight trains. The train crew on passenger trains traditionally consisted of a conductor, a train porter or head-end brakeman, a rear-end brakeman, a fireman, and engineer. Arizona and California, in the Coast Lines subdivision, and Texas, had at one time full crew laws. These laws required that two brakemen be employed. As a result, train porters did not work in Arizona and California. Full crew law requirements were abolished by 1964.

After 1944, except in full crew law states, Santa Fe phased out train porters or head-end brakemen on passenger trains, accomplishing this through attrition and the reduction of passenger service. After 1964, Santa Fe phased out head-end brakemen in the full crew law states, except where labor agreements dictated otherwise. Head-end braking functions were assumed by other members of the operational crew after being phased away from brakemen and train porters. The last train porter on the Santa Fe last worked in July 1975.[3] Those plaintiffs who are still active with the railroad work in capacities other than train porter.

Effective May 1, 1971, the Santa Fe discontinued passenger trains and Amtrak took over passenger service.

A head-end brakeman or a train porter on a passenger train performed the same duties. These were:

(a) Inspect cars and test signal and brake apparatus for the safety of train movement.

(b) Use hand and lamp signals for the protection and movement of trains.

(c) Open and close switches.

(d) Couple and uncouple cars and engines and the hose and chain attachments thereof.

(e) Compare watches when required by rule.[4]

These employees also assisted the conductor and performed work directed and supervised by the conductor.

A train porter on a passenger train performed additional duties, attending to passengers in the first car and the interior condition of the car. A train porter wore a uniform. Train porters worked only on passenger trains. Train porters and head-end and rear-end brakemen on passenger trains received the same mileage rate or hourly rate from 1918 until termination of the job of train porter in 1975. However, the brakemen on passenger trains received additional compensation such as pay in connection with delays not paid to a train porter. The total wages to a brakeman on a passenger train were higher than the total wages paid to a train porter on a passenger train. Brakeman rate of pay varied by type of train.

---

3. Joe Vernon Sears, the last train porter with the Santa Fe, retired in August 1975.

4. These duties were described in this manner in Supplement No. 12 to General Order 27, issued by the District General of Railroads on December 2, 1918. General Order 27 also provided:

Effective June 1, 1918, colored men employed as firemen, trainmen and switchmen shall be paid the same rate of wages as are paid white men in the same category.

Supplement No. 12 to General Order 27 also provided:

2. Where white brakemen are not employed, the compensation and overtime rule for colored brakeman shall be the same, for both passenger and freight service, as for the same positions on the minimum paid contiguous road.

3. This order shall not curtail the duties of employees heretofore classed as "train porters."

4. This order shall not infringe upon the seniority rights of white brakemen.

Most passenger trains also carried chair car attendants. Chair car attendants are non-operational personnel, and do not perform any braking duties. The duties of a chair car attendant include attending to the passengers in a given train car or cars and to the condition of the interior of the car or cars. He works passenger trains only.

Brakemen had additional duties on non-passenger train runs. On local freight trains, a brakeman's duties included inspecting the consist of the train (i. e., the arrangement or alignment of freight cars on a freight train in accordance with operating procedures and safety regulations), adjusting the consist of the train, walking alongside the train for inspection at stops, dropping off empty and full freight cars for customers, picking up empty and full freight cars from customers, respotting cars, and repairing cars dropped off by through freight trains. Uniforms were not required or worn by local freight brakemen since the work and equipment soiled any clothing worn. The duties of a brakeman on a through freight train were substantially similar to those on a local freight train.

A yardman or switchman works within a specific geographic area, the train yard. A yardman switches freight and passenger equipment, transfers freight and passenger equipment, and handles construction and maintenance of way trains and work trains operating in the yardman's territory. On May 30, 1960, the seniority lists of yardmen and brakemen were dualized on the Santa Fe. After May 30, 1960, to the present time, a new hire generally starts work in the yard moving cars, switching, performing minor car repairs and other railroad yard work. After gaining sufficient seniority the yardman can move to the freight extra board protecting local and freight brakeman service and then passenger services (now discontinued), if seniority permits

and the brakeman is qualified and so desires.

The conductor of a freight or passenger train had the ultimate responsibility for the operation of a train, pursuant to the operating rules of the Santa Fe and train orders.

A flagman performs flagman functions and rear-end braking on a passenger train.

The term "trainmen" is generally understood to mean freight and passenger brakemen, flagmen, train baggagemen, and brakemen baggagemen.

Railroad crafts or classes are denominated by the National Mediation Board,[5] which designated employees of a carrier according to traditional work functions who are generally organized with a certified representative to make and maintain agreements with the carrier under the Railway Labor Act. This law suit is concerned with the crafts of train porter, brakeman, conductor, and tangentially chair car attendant insofar as many plaintiffs and class members have served as chair car attendants with the Santa Fe. The ORC&B was certified to represent the conductors on the Santa Fe in 1926. The BRT was certified to represent the brakemen on the Santa Fe in 1926. The BSCP was certified to represent the train porters and chair car attendants in separate proceedings on April 5, 1946. From and after the dates of the above respective certifications, the conductors, brakemen and train porters and chair car attendants were recognized as separate crafts under the Railway Labor Act. The crafts were recognized by the federal government in General Order 27 in 1918 (*See* note 4).

The position of train porter was created by the Santa Fe on or about March 1, 1899. Train porter positions have always been filled by black males. In most instances

---

**5.** The National Mediation Board is an independent agency in the executive branch of government established by the Railway Labor Act, and is known as the Mediation Board. Parties or either party to a dispute between employees and carrier concerning changes in rates of pay, rules, or working conditions, or any other dispute not referable to the National Railway Adjustment Board may invoke the services of the Mediation Board. The National Railway Adjustment Board, also known as the Adjustment Board, is divided into four divisions with jurisdiction over disputes involving employee crafts within that division.

between the dates of 1918 and 1959,[6] the entry level job with the Santa Fe for a black man was the position of chair car attendant. Chair car attendants could qualify for, and be promoted to, the position of a train porter upon taking a Rules Examination, completing student trips on passenger trains, and satisfactorily passing a physical examination. The Rules Examination was both written and oral, and the written portion thereof consisted of an open book test containing questions concerning the Santa Fe operating Book of Rules. This examination was not a test which was failed or passed, and was used by the Santa Fe as a learning process to familiarize the applicant with the Santa Fe operating rules. Likewise, the later oral examination was administered for the purpose of determining whether the applicant understood the Santa Fe Book of Rules and to clear up any misunderstanding he might have with respect to them. The Rules Examination was given by the train master at the location of the application. Upon satisfactory completion of the Rules Examination, student trips and physical examination, a black chair car attendant was promoted to the position of train porter and was thereafter qualified to perform front end braking duties on passenger trains. Also, in certain instances, the Santa Fe would directly hire a black man as a train porter, and on other occasions train porters were hired by the Santa Fe from other jobs. There was no requirement that a chair car attendant proceed in a timely manner to the craft of train porter or else lose his job with the Santa Fe.

The Santa Fe has, at all times, maintained seniority districts within the operating divisions for each craft. The seniority district is a certain geographic area and within the district a published seniority roster is maintained. The seniority roster carried an individual's seniority date, which is the earliest date of continuous service on the Santa Fe, in a given craft. Seniority in craft determines the right to protect work within the craft (within the seniority district), to obtain regular runs, order of furlough and recall, as well as other employment rights. Seniority is not transferable from one seniority district to another, nor is it transferable from one craft to another craft.

Seniority as a chair car attendant began as of the date the man first went to work as a chair car attendant. The seniority date on a Santa Fe train porter's seniority roster was the date a man first became qualified as a train porter. A train porter continued to accumulate seniority on a chair car attendant's roster after he began working as a train porter, in addition to his train porter seniority. At all times, and within the various seniority districts for chair car attendants and train porters, two separate seniority rosters were maintained with one being for train porters and the other being for chair car attendants. On May 1, 1950, the BSCP and Santa Fe executed a collective bargaining contract for chair car attendants which set forth seniority provisions for chair car attendants. Prior to this time, the seniority system for chair car attendants had been maintained by Santa Fe on the basis of custom and practice. There has never been a written collective bargaining agreement covering seniority for train porters, although the Santa Fe and the BSCP did enter into written contracts concerning rates of pay, vacations, and prescribed uniforms for the train porters. The seniority system for Santa Fe train porters was established through custom, practice, published seniority rosters, and recognized by the Train Service Board and National Railway Adjustment Board (successor to the Train Service Board) decisions during the years the Santa Fe employed train porters, and was based upon time and service on the Santa Fe in a train porter's seniority district.[7]

---

6. After 1959, the Santa Fe was prohibited from hiring a new man to the job of train porter because of the ruling in Award 19324, discussed *infra*.

7. It is the testimony of plaintiff Arthur L. Woolfolk, who was active in the union affairs of the BSCP, that Santa Fe always took the position with the BSCP that Santa Fe did not want to negotiate a contract for the train porters

A chair car attendant started working off of the chair car attendant's extra board [8] until he had sufficient seniority to bid for an advertised regular job on a passenger train in his seniority district. After becoming a train porter, he would continue to work as a chair car attendant and off of the train porter's extra board, protecting against temporary vacancies in train porter positions. After accumulating sufficient seniority, he could likewise obtain a regular job as a train porter on a Santa Fe passenger train.

A non-black man desiring to be a brakeman qualified for that position with the Santa Fe upon taking a Rules Examination, completing student trips on local freight trains, and by satisfactorily passing a physical examination. The Rules Examination for a brakeman applicant and the administration thereof was the same as for train porters. Upon satisfactory completion of the Rules Examination, student trips and physical examination, the applicant was employed by the Santa Fe as a brakeman qualified to perform braking duties on the Santa Fe. Generally, prior to 1971, although the requirement varied from time to time, the Santa Fe required a high school education as a qualification for an applicant to the position of brakeman. This requirement was eliminated in 1971 by the Santa Fe. From 1918 until July 2, 1965, with the exception of the Silsbee, Texas Seniority District,[9] front-end and rear-end braking duties on Santa Fe freight trains were performed exclusively by non-black males employed by the Santa Fe as brakemen. The seniority system for Santa Fe brakemen mandated the promotion of a stated number of brakemen to the position of conductor on the basis of seniority, and only after they had had at least two years experience in the freight service. Promotion from brakeman to conductor was mandatory if the employee was to stay in service. Brakemen took a qualifying examination as a prerequisite to becoming a conductor. On July 2, 1965, the effective date of Title VII, except in the Silsbee District the Santa Fe did not employ a single black conductor. There were no black conductors outside the Silsbee District until 1970.

A brakeman's seniority began as of the date the man first started to work as a brakeman or, after the dualization of the yardmen and brakemen's seniority system in 1960, the date he first started to work as a Santa Fe switchman-brakeman. The seniority date on a Santa Fe conductor's seniority roster was determined as of the date a man was promoted to, or hired as, a Santa Fe conductor. Within the seniority districts separate seniority rosters were maintained for brakemen and conductors.

Under the seniority system for Santa Fe brakemen, prior to 1960, a new hire normally started protecting all extra services for which he qualified, which could be local freight, through freight, mixed trains, passenger trains, road switchers and work trains. After accumulating sufficient seniority the brakeman could obtain regular

until the "Hunter Litigation," which culminated in Award 19324, was finally terminated or resolved.

8. Working off the extra board generally meant that the employee was available for call to temporarily take the place of an employee who did hold a regular job, but who was absent for reason of illness, vacation or otherwise. The employee called off the extra board would be protecting the job or work for which he was called. When vacancies occurred in regularly held or full-time jobs, the jobs would be "advertised" for bid by Santa Fe, usually through a bulletin, and the employee with the most seniority who bid pursuant to the advertisement got the job.

9. The Silsbee, Texas Seniority District has been something of an anomaly in the history of the Santa Fe, for black rather than white males have been predominantly employed as brakemen in that district. There were 55 black brakemen in the Silsbee District as of the effective date of Title VII. However, there were apparently no black conductors in the Silsbee District as of the effective date of the Act. It is the testimony of Fred Douglas Woodberry, who has been employed in the Silsbee District as brakeman, conductor, and engine foreman, that from July 22, 1940 until September, 1965, there were no black conductors in the Silsbee District. Statistics indicate that as of 1965, there were four black conductors in the Silsbee District.

braking jobs on through freight trains. Generally a brakeman needed substantial seniority to obtain a regular braking job on passenger trains. Some brakemen never sought braking work on passenger trains; and once a brakeman obtained a regular position as a brakeman on a passenger train, he could also return to freight service by exercising his seniority rights. In 1960 and thereafter, after the seniority systems of yardmen and brakemen were dualized, a new hire seeking a job as brakeman would generally start on the extra board for yardmen, performing switching work. With sufficient seniority, a switchman-yardman could obtain a regular position in the Santa Fe, and as the extra board for Santa Fe brakemen required more men, he could obtain a position on the brakemen's extra board on the basis of his seniority. He could then proceed as a brakeman as outlined above.

The seniority system for brakemen and conductors was established under collective bargaining contracts negotiated by the BRT and ORC&B with the Santa Fe. From prior to 1892 until merged into the UTU on January 1, 1969, the BRT and ORC&B were separate labor unions; both unions represented the crafts of brakemen and conductors from before 1892 until the merger; both unions were certified to represent their respective craft of brakeman and conductor on the Santa Fe in 1926. The first known contract containing seniority provisions was an agreement executed on April 1, 1892, by the Santa Fe and the BRT and the Order of Railway Conductors, predecessor to the ORC&B. Thereafter, according to all evidence before this Court, separate contracts were negotiated by the BRT and the ORC&B with Santa Fe, and those contracts likewise contained seniority provisions for brakemen and conductors respectively. The evidence includes seniority provisions from Santa Fe's Schedule of Rates, Rules and Regulations for Trainmen dated 1904, 1907, 1910, 1917, 1923, 1928, 1940, 1943, 1948, 1956, 1964, and 1966. At all times, an employee's seniority date in a craft began when he first worked in or was promoted to that craft, and position on a seniority roster determined the type of work and promotion opportunities an employee could attain.

In 1883 the BRT established its first Constitution. Membership requirements were: male, sober, industrious and employed as a brakeman by a railroad. By 1939, the BRT Constitution provided that a candidate for membership shall have been employed as a railroad trainman for at least one month prior to application for admission and shall be white, male, sober, industrious and join of his own free will. The evidence before the Court does not disclose, and the parties do not know, if the 1939 requirement that a BRT member be white was in existence before 1939. The requirement that a member be white was retained by the BRT until 1960. The first known Constitution of the ORC&B is dated May 7, 1934, and requires for membership: any white male who had qualified as a train or yard conductor and had at least six months experience in road or yard service at the time of application. The requirement that a member be white was retained by the ORC&B until 1966. The UTU, successor to the BRT and the ORC&B, provides in its 1975 Constitution that any person of good moral character employed in a craft represented by the UTU is eligible to membership.

Hiring and promoting employees is a retained right of management of the Santa Fe, and unions are not authorized to make these decisions.

The certified bargaining representatives of brakemen have acted throughout the history of the railroad to ensure that braking duties are performed by its members. Beginning not later than 1920, the BRT made several attempts to transfer braking duties from black train porters to white brakemen. These attempts took the form of letter requests, demands, legislative lobbying, proceedings before the Train Service Board of Adjustment, the National Railroad Adjustment Board, First Division, and were also the subject of litigation in the federal courts. It appears from the evidence that BRT had no black members, nor Santa Fe black brakemen or conductors, at any time

when these attempts were made. The BRT was ultimately successful. In Award 19324, issued October 14, 1959, the National Railroad Adjustment Board, First Division, held that only those train porters holding a seniority date prior to April 20, 1942, could perform front-end braking as a part of their duties. All train porters who had a seniority date subsequent to April 20, 1942, were demoted to chair car attendants and could no longer work as train porters.

The main thrust of the BRT protests was that contracts between the BRT and the Santa Fe provided for the seniority rights and duties of brakemen, that on passenger trains the duties of head-end brakemen were being performed by train porters, and that the train porters were not on the brakemen's seniority roster. This protest can be seen in a number of incidences. The General Chairman for the BRT, S. R. Harvey, sent a letter, September 30, 1920, to the Santa Fe's Eastern and Western Line General Managers complaining of the use of train porters; the Santa Fe responded that it would not replace train porters with brakemen because the train porters performed additional duties which would be distasteful to the brakemen. The BRT protested the use of train porters in Case No. 2167 to the Train Service Board for the Western Region in June, 1926; in Award 2126, the protest was denied. The BRT protested the use of train porters in Case No. 2359 to the Train Service Board in November, 1926; in Award 2336, the protest was denied. The General Chairman for the BRT, H. W. Gross, sent a series of letters to the Santa Fe in 1932, proposing negotiations for the consolidation of the seniority of brakemen and train porters on all divisions of Santa Fe's Eastern and Western Lines; the Santa Fe responded that it would not negotiate such a consolidation because the BRT did not represent the train porters and because the request of the BRT amounted to nothing more than a restatement of the protests previously filed with the Train Service Board. The BRT

filed a protest in 1939 with the National Railroad Adjustment Board, First Division, Docket 7400; this protest ultimately resulted in Award No. 19324. On April 20, 1942, the National Railroad Adjustment Board, First Division, sustained the protest filed by the BRT and in Award 6640 ruled that the front-end braking duties on Santa Fe passenger trains should be performed by brakemen holding seniority as such on the Santa Fe brakemen's seniority roster. Award 6640 was challenged in a series of cases known as the "Hunter Litigation," brought in the United States District Court for the Northern District of Illinois, Eastern Division. The court entered a temporary injunction against the enforcement of Award 6640 on the theory that the train porters did not receive notice of the proceedings. *Hunter v. Atchison, T. & S. F. Ry. Co.,* 78 F.Supp. 984 (N.D.Ill.1948), *aff'd* 171 F.2d 594 (7th Cir. 1948). A permanent injunction was then entered by the trial court. This was reversed by the Seventh Circuit on the basis that the trial court should have heard evidence on the issue of whether the train porters, as a class, had actual notice of the prior proceedings before the National Railroad Adjustment Board, even though they had not received formal notice. *Hunter v. Atchison, T. & S. F. Ry. Co.,* 188 F.2d 294 (7th Cir. 1951). On August 8, 1958, the trial court remanded the case to the National Railway Adjustment Board. On October 14, 1959, the Board ruled in favor of the BRT in Award 19324, holding that only those train porters with a seniority date prior to April 20, 1942, the date of Award 6640, could continue to work as train porters. Since 1956, approximately three years prior to Award 19324, the Santa Fe had not hired or promoted any person to the position of train porter. Pursuant to the Railway Labor Act, the Santa Fe was bound by Award 19324 and therefore demoted to chair car attendant all persons with a train porter seniority date subsequent to April 20, 1942.[10]

10. Of the plaintiffs and class members listed in the pretrial order, the following men had a train porter seniority date prior to April 20,

1942: Joe Vernon Sears, Edward Rawlins, Theodore Butler, Luther Prince, Oscar Alfred Walker, William D. Christopher, Archie N.

The Court notes that there were other efforts by the BRT on behalf of brakemen, involving other railways, to assume braking duties performed by train porters on passenger trains.[11]

We turn now to events occurring after the effective date of Title VII. On February 7, 1965, railroads which included the Santa Fe, represented by the National Railway Labor Conference, and five unions comprising the Employee's National Conference Committee (not including the BSCP, BRT, or ORC&B) executed a mediation agreement in Case No. A–7128. This agreement is commonly referred to as the "Feb. 7 Agreement." A year later on February 8, 1966, the BSCP and the Santa Fe executed an agreement extending the Feb. 7 Agreement, along with agreed-upon interpretations thereof, to plaintiffs and class members, effective February 8, 1966. Those plaintiffs and class members that were covered by the agreement, by its terms, are "chair car attendants of this Company [Santa Fe] whose wages and working conditions are subject to the agreement between this Carrier and the Brotherhood of Sleeping Car Porters." The Feb. 7 agreement protects the employee until death, retirement, resignation, dismissal for cause in accordance with existing agreements, failure to retain or obtain a position available to him in the exercise of his seniority rights, or any period in which he occupies a position not subject to the working agreement. The Feb. 7 agreement established a base of wage protection for those protected employees. The protected employee is guaranteed a certain level of income even if furloughed or employed in a job normally paying a lower level of income. The Feb. 7 agreement also prohibits the Santa Fe from transferring a protected employee from his craft or class to another craft or class on the Santa Fe.

On at least one occasion the BSCP took steps to ensure that Santa Fe followed the Feb. 7 agreement. In a letter dated November 16, 1967, Vice President of the BSCP, T. D. McNeal, objected to Santa Fe offering switchman and other positions to chair car attendants covered by the agreement. The Santa Fe responded by letter, December 19, 1967, that the employees in question had applied for employment as switchmen-brakemen, that they had not been approached by the Santa Fe to cross craft lines, and that they had voluntarily relinquished chair car attendant seniority to accept employment as switchmen-brakemen. The outcome of this correspondence was that the BSCP and Santa Fe negotiated a further agreement permitting Santa Fe to assign protected employees, if qualified, to other jobs on the Santa Fe, including but not limited to brakeman, switch-

---

Jones, Forrest P. Tollett, Earlie Nash, William H. Cheers, Robert H. Garner, Jr., George Guest, Obie F. Hunter, James P. Jackson, Frank C. Knighton, Herbert C. Knighton, Marion R. Mitchell, Sherwood Moore, Cecil M. Robinson, Vaughn H. Smith, Baylon K. Thaw, Ray O. Wagner, C. B. Williams, G. L. Williams, Wilborn Williams, and Offie Wimberly. The following men had a train porter seniority date subsequent to April 20, 1942: Albert L. Bennett, Jimmie E. Brown, Bobbie Charles Papin, C. J. Skelton, T. J. White, Elgie Crow, Ellis Johnson, Obie Wright, Thomas H. White, Samuel Marvin Talbert, Jr., John W. Landrum, Lawson C. Spencer, Aubrey A. Robinson, John W. Cole, Charles A. Majors, Jr., Jessie J. Smith, Paul H. Stewart, Carl E. Chester, Raymond I. Wiley, Robert W. Austin, Willie Combs, Leon A. Finley, E. S. Garth, J. R. Garth, John S. Henry, Jr., Robert L. Hollowell, Herbert L. Jenkins, Eugene E. McGaugh, Leroy Preston, Pink Reynolds, Vernon M. Robinson, Levi E. Southall, William Steward and A. L. Woolfolk. Of the foregoing men, most are disability annuitants, retired, or deceased.

11. See, e. g., the "Howard Litigation," *Howard v. Thompson*, 72 F.Supp. 695 (E.D.Mo.1947); *Howard v. St. Louis-San Francisco Ry. Co.*, 191 F.2d 442 (8th Cir. 1951); *Brotherhood of Railway Trainmen v. Howard*, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952); *Howard v. St. Louis-San Francisco Ry. Co.*, 215 F.2d 690 (8th Cir. 1954); and the "Randolph Litigation," *Randolph v. Missouri-Kansas-Texas Ry. Co.*, 68 F.Supp. 1007 (W.D.Mo.1946); *Randolph v. Missouri-Kansas-Texas Ry. Co.*, 7 F.R.D. 54 (W.D. Mo.1947); *Missouri-Kansas-Texas Ry. Co. v. Randolph*, 164 F.2d 4 (8th Cir. 1947); *Randolph v. Missouri-Kansas-Texas Ry. Co.*, 78 F.Supp. 727 (W.D.Mo.1948); *Randolph v. Missouri-Kansas-Texas Ry. Co.*, 85 F.Supp. 846 (W.D. Mo.1949); *Missouri-Kansas-Texas Ry. Co. v. Randolph*, 182 F.2d 996 (8th Cir. 1950); *Wood v. Randolph*, 209 F.2d 634 (8th Cir. 1954).

man, fireman, or clerk. The employees so assigned would retain previously accumulated seniority as chair car attendants and therefore retain their status as protected employees under the Feb. 7 agreement. This extension of the Feb. 7 agreement was finalized between the BSCP and Santa Fe, March 23, 1971.

*Testimony of Individual Plaintiffs*

Several individual plaintiffs testified by summary of testimony. We note the following as common threads running through their testimony which are relevant to our enquiry:

Train porters and chair car attendants had the same annual physical examination as that given to brakemen and conductors.

A train porter's braking duties took priority over his clean-up duties; the clean-up duties were not performed when the braking duties required extra time.

Upon occasion, some train porters would assume the conductor's function when the conductor was drunk or otherwise unable to work, and would also on occasion be asked by a Train Master to watch over a new conductor while he was learning his duties. [Edward Rawlins, Luther Prince, William D. Christopher].

Plaintiffs and class members, all of whom have worked as train porters, feel and felt themselves qualified by their train porter experience to assume the duties of yardman or freight or passenger brakeman. Although non-passenger train brakemen had duties in addition to those of a passenger train porter, these additional brakemen duties were not difficult to learn, in the opinion of plaintiffs. Former train porters who became brakemen had no problem performing their duties as brakeman or brakeman-switchman due to their past experience and knowledge. [Jimmie E. Brown, Bobbie Charles Papin, Ellis Johnson, Samuel Marvin Talbert, Jr.].

■ Brakeman and conductor jobs were white jobs, while train porter and chair car attendant jobs were black jobs. As far as many plaintiffs and class members knew, the first black brakemen were Bobbie Charles Papin in 1968 and Leroy Beeson in 1969.[12]

12. EASTERN AND WESTERN LINES OF THE SANTA FE RAILWAY CO.,

EMPLOYMENT OF BRAKEMEN AND CONDUCTORS

BRAKEMEN

| YEAR | ALL RACES | | | NEGRO | | | PERCENT NEGRO | SB N* | TOTALS LESS SILSBEE | | |
|------|-----------|-----------|-------|-----------|-----------|-------|---------------|-------|----------|-------|---------------|
| | EAST-ERN | WEST-ERN | TOTAL | EAST-ERN | WEST-ERN | TOTAL | | | ALL RACE | NEGRO | PERCENT NEGRO |
| 1965 | 2469 | 2452 | 4921 | 0 | 56 | 56 | 1.1379 | 56 | 4865 | 0 | 0 |
| 1966 | 2478 | 2047 | 4525 | 0 | 65 | 65 | 1.4364 | 65 | 4460 | 0 | 0 |
| 1967 | 2478 | 2081 | 4559 | 0 | 74 | 74 | 1.6237 | 69 | 4490 | 5 | .1113 |
| 1968 | 2280 | 2136 | 4416 | 1 | 92 | 93 | 2.1059 | 76 | 4340 | 23 | .5299 |
| 1969 | 2373 | 2245 | 4618 | 7 | 109 | 116 | 2.5119 | 75 | 4543 | 31 | .6823 |
| 1970 | 2248 | 2145 | 4393 | 6 | 115 | 121 | 2.7543 | 82 | 4311 | 41 | .9510 |
| 1971 | 2814 | 2198 | 5012 | 11 | 121 | 132 | 2.6336 | 82 | 4930 | 50 | 1.0141 |
| 1972 | 2745 | 2115 | 4860 | 17 | 144 | 161 | 3.3127 | 79 | 4781 | 82 | 1.7151 |
| 1973 | 2861 | 2576 | 5437 | 48 | 212 | 260 | 4.7820 | 84 | 5353 | 186 | 3.4746 |
| 1974 | 2640 | 2522 | 5162 | 58 | 191 | 249 | 4.8237 | 84 | 5078 | 165 | 3.2493 |
| 1975 | 2361 | 2355 | 4716 | 65 | 183 | 248 | 5.2586 | 86 | 4630 | 162 | 3.4989 |
| 1976 | 2251 | 2198 | 4449 | 73 | 169 | 242 | 5.4394 | 89 | 4360 | 153 | 3.5091 |

CONDUCTORS

| YEAR | EAST-ERN | WEST-ERN | TOTAL | EAST-ERN | WEST-ERN | TOTAL | PERCENT NEGRO | SB N* | ALL RACE | NEGRO | PERCENT NEGRO |
|------|----------|----------|-------|----------|----------|-------|---------------|-------|----------|-------|---------------|
| 1965 | 1061 | 1092 | 2153 | 0 | 4 | 4 | .1857 | 4 | 2149 | 0 | 0 |
| 1966 | 1072 | 956 | 2028 | 0 | 17 | 17 | .8382 | 17 | 2011 | 0 | 0 |
| 1967 | 1047 | 967 | 2014 | 0 | 27 | 27 | 1.3406 | 27 | 1987 | 0 | 0 |
| 1968 | 988 | 1062 | 2050 | 0 | 34 | 34 | 1.6585 | 34 | 2016 | 0 | 0 |
| 1969 | 1000 | 1213 | 2213 | 0 | 36 | 36 | 1.6267 | 36 | 2177 | 0 | 0 |
| 1970 | 1070 | 1236 | 2306 | 0 | 50 | 50 | 2.1682 | 48 | 2258 | 2 | .0885 |
| 1971 | 1020 | 1214 | 2234 | 0 | 57 | 57 | 2.5514 | 48 | 2186 | 9 | .4117 |
| 1972 | 1023 | 1239 | 2262 | 0 | 64 | 64 | 2.8293 | 54 | 2208 | 10 | .4529 |

Some plaintiffs and class members applied for brakeman positions after the effective date of Title VII. Common experiences of these applicants were being told that the applicant was too old [T. J. White, Joe Vernon Sears, Oscar Alfred Walker], being told that the applicant would have to give up all previous seniority as train porter or chair car attendant and begin at the bottom of the brakeman seniority roster [C. J. Skelton, Sears, Walker], being told that Santa Fe was not taking applications [Elgie Crow, Thomas H. White], in an application made before Title VII being told that black men couldn't be brakemen [William D. Christopher], or being told that Award 19324 would not allow it [Crow] (Award 19324 was most commonly referred to, however, in connection with a chair car attendant's request to assume train porter duties). At least one plaintiff who was told he was too old for the position was subsequently asked by the Santa Fe to transfer to a brakeman position [T. J. White]. Other plaintiffs and class members testified that they did not apply for brakeman positions because they knew of these experiences of others and felt that there was no point in applying to be a brakeman [Talbert, Johnson, Thomas H. White]. Others refused to apply for or accept a brakeman position because they would have had to forfeit train porter and chair car attendant seniority [Sears, Rawlins, Skelton]. One plaintiff testified that after a Santa Fe official saw him looking at an equal opportunity poster which was posted in a Santa Fe office in 1967 or 1968, the poster was no longer on the wall. [Skelton].

During all periods in question, brakemen or switchmen-brakemen were regularly hired by Santa Fe and Santa Fe regularly promoted brakemen to conductor. These positions were always open even in periods of force reduction due to resignation, death,

EASTERN AND WESTERN LINES OF THE SANTA FE RAILWAY CO.,

EMPLOYMENT OF BRAKEMEN AND CONDUCTORS

CONDUCTORS

| YEAR | ALL RACES | | | NEGRO | | | PERCENT NEGRO | SB N* | TOTALS LESS SILSBEE | | |
|------|---------|---------|-------|---------|---------|-------|---------|-----|-----------|-------|---------|
| | EAST-ERN | WEST-ERN | TOTAL | EAST-ERN | WEST-ERN | TOTAL | | | ALL RACE | NEGRO | PERCENT NEGRO |
| 1973 | 1031 | 1281 | 2312 | 0 | 65 | 65 | 2.8114 | 55 | 2257 | 10 | .4430 |
| 1974 | 1005 | 1514 | 2519 | 0 | 69 | 69 | 2.7391 | 55 | 2464 | 14 | .5681 |
| 1975 | 943 | 1530 | 2473 | 0 | 73 | 73 | 2.9518 | 56 | 2417 | 17 | .7033 |
| 1976 | 944 | 1472 | 2416 | 0 | 90 | 90 | 3.7251 | 63 | 2353 | 27 | 1.1474 |

Note: Data for 1973 were recorded in March; for all other years the month record is July.

There is expert testimony that in the regions from which the Santa Fe would probably draw its employees, black males would constitute 9.2% of the relevant labor market in 1965, defined as males 25 years of age or over with a high school education and up to three years of college. Defendants challenge this, and state that the Court should not consider any statistical evidence. They allege that the statistics offered by plaintiff as to employment of black brakemen and conductors on the Santa Fe are invalid under *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), stating that the proper group of employees to examine is the active class members rather than all black brakemen, that the black male population of the regions served by the railroad possessing a high school education is not the proper labor pool, and that the statistics are incomplete. A prima facie case of pattern or practice discrimination may of course be established by statistics alone. *Hazelwood, supra*. However, we do not rely on statistics to hold that plaintiffs have made out a prima facie case of discrimination. *See* text, *infra*. The Supreme Court has indicated that statistics come in infinite variety and that their usefulness depends on all of the surrounding facts and circumstances. *Teamsters*, 431 U.S. at 339, 97 S.Ct. at 1856, 52 L.Ed.2d at 418. We need accept neither plaintiffs' statistics nor defendants' challenges to those statistics to conclude, as we do, that for all the years before Title VII and for several years after Title VII, there were few or no black brakemen and conductors. The statistics merely indicate the point in time at which the railroad began employing blacks as brakemen and conductors, thereby buttressing plaintiffs' contention that they were not so employed until well after the effective date of Title VII, which in turn supports their contention that they were discriminated against on the basis of race.

disability, or promotion of the Santa Fe brakemen or conductors.

Plaintiffs and class members are of the opinion that age would have been no bar to their employment as brakemen and conductors, for they were already experienced as brakemen, and white men as old as they or older were performing the duties of brakemen and conductors.

Certain plaintiffs and class members were either transferred by Santa Fe on its own initiative or after application by the respective employee to brakeman and other positions; these transfers generally taking place after 1971. [Johnson, T. J. White]. Bobbie Charles Papin was the first black brakeman on the Santa Fe Eastern Lines, and he was transferred on his own application in 1968 to the position of brakeman. Mr. Papin testified that he wore all white clothing to work his first day as switchman-brakeman, because he was afraid of the possibility he could be hurt if someone might "accidentally" not see him.

During the 1940's and 1950's, Santa Fe filled some head-end braking positions with employees known as brakemen-baggagemen. These employees were white. Train porters could not bid for brakemen-baggagemen positions, nor could brakemen-baggagemen bid for train porter positions, although they performed the same braking duties.

A few plaintiffs and class members applied for membership in the BRT, feeling that such union membership would aid their quest to obtain brakeman positions. Of these, at least one, Edward Rawlins, was told that the BRT could not represent him as he was a train porter already represented by the BSCP. Elgie Crow was also refused BRT membership. However, one such attempt was successful. Luther Price applied for BRT membership in 1964 and was accepted. The local BRT, through J. M. Phillips, General Chairman of the BRT, helped Prince protect his front-end braking position on Santa Fe passenger trains. Four other train porters were also accepted for BRT membership. In correspondence

with Santa Fe, 1964–65, Mr. Phillips maintained the position that these five men were protected as trainmen by the BRT, although Santa Fe took the position that the BRT could not represent these train porters. The BRT prevailed, and in the 1968 agreement between the BRT and the Santa Fe, Schedule of Pay, Rules and Regulations governing Santa Fe trainmen, four of the men, L. T. Prince, O. Wimberly, C. M. Robinson, and J. W. Shelby, are listed as porter-brakemen who would retain rights to regular head-end passenger assignments in their respective seniority districts.

The black Silsbee, Texas brakemen formed a BRT lodge on July 11, 1965. The BRT thereafter, in August 1965, requested the Santa Fe to allow the Silsbee brakemen the opportunity for promotion to conductor. The Santa Fe, in a letter dated August 31, 1965, agreed that black trainmen at Silsbee would be afforded that opportunity. The procedure was to be that the Silsbee trainmen would be contacted in order of seniority and afforded an opportunity to pass the written and oral examination for conductor. Each trainman would have the opportunity to waive such examination, and in addition, if the examination was taken and failed, the employee's seniority as trainman would not be affected. This procedure may be contrasted to the general contract between BRT and Santa Fe, covering white brakemen, which required that the brakeman take the conductor's exam within three years of becoming a brakeman, no waiver being permitted, and upon twice failing the exam, the brakeman would be dismissed or assigned to other service. However, as to any black trainman employed at Silsbee after August 31, 1965, the Santa Fe stated that such trainman would be required to pass the conductor examination under the usual terms, with no waiver being permitted.

Excluding the deceased, retired, and disability annuitants, the possible active class members at the date of trial and their occupations are as follows:

| Name | Craft or Classification |
| --- | --- |
| Elgie Crow | Brakeman and conductor |
| A. M. Bennett | Brakeman and conductor |
| A. L. Woolfolk | Brakeman and conductor |
| T. C. Luckey | Brakeman and conductor |
| Raymond I. Wiley | Brakeman and conductor |
| Bobbie C. Papin | Flagman (restricted to flagman on passenger service) |
| Carl E. Chester | Fireman and oiler laborer |
| Samuel M. Talbert, Jr. | Locomotive Fireman and Locomotive Engineer |
| Herbert L. Jenkins | Librarian |
| Archie N. Jones | Security guard |
| Lawson C. Spencer | Business Car chef-porter |
| Criscell Kemp | Receiving benefits under Feb. 7 Agreement |
| W. W. Seymour | Brakeman on leave of absence since October 21, 1971 from Santa Fe to perform services as International Secretary-Treasurer of BSCP |
| A. L. Bennett | Employed by Amtrak since May 1, 1974 as chair car attendant |
| Forrest P. Tollett | Employed by Amtrak since May 1, 1974 as chair car attendant |
| Earlie Nash | Employed by Amtrak since May 1, 1974 |

Neither the UTU nor the BSCP represent the craft or class of fireman, oilers and laborer, locomotive engineer, librarian, security guard, or business car chef-porter.

All other plaintiffs and class members are retired, deceased, or disability annuitants.

Effective May 1, 1971, the Santa Fe discontinued passenger service. Effective that date, Amtrak took over. Effective May 1, 1974, all non-operational personnel on passenger trains operated by Amtrak on Santa Fe lines became employees of Amtrak; all operational personnel remained employees of the Santa Fe.

## THE LAW

42 U.S.C. § 2000e–2 provides in pertinent part:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

The plaintiff in a Title VII case is required to establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Since plaintiffs here have alleged a systemwide pattern or practice of discrimination, they must establish more than the "mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." They must establish that "racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice," and of a "repeated, routine, or of a generalized nature." *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855, 52 L.Ed.2d at 416 and n. 16. "The basic framework in a pattern-or-practice suit . . . under Title VII of the Civil Rights Act is the same as that in any other lawsuit. The plaintiff has the burden of proving a prima facie case; if it does so, the burden of rebutting that case shifts to the defendant." *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) (Stevens, J., dissenting). "At the initial, 'liability' stage of a pattern or practice suit the [plaintiff] is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed." *Teamsters,* 431 U.S. at 360, 97 S.Ct. at 1867, 52 L.Ed.2d at 430.

There can be no question that Santa Fe, except for the Silsbee District, deliberately segregated whites into brakeman and

conductor positions and blacks into chair car attendant and train porter positions. There can be no question that this segregation was approved by, acquiesced in, and maintained and demanded by the "white" unions. The evidence is clear. For almost all the years of the Twentieth Century to date, there have been no black brakemen, no white train porters. Both positions required the performance of substantially similar braking duties; the difference in additional duties is insignificant compared to the similarity of total duties. The fact is that employees performing essentially the same duties were segregated into job category by race, and the evidence is overwhelming that such segregation was intentional. This is disparate treatment.

"Disparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.

.   .   .   .   .

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but in fact fall more harshly on one group than another and cannot be justified by business necessity . . . Proof of discriminatory motive, we have held, is not required under a disparate impact theory. . . .

*Teamsters,* 431 U.S. at 335, 97 S.Ct. at 1854, 52 L.Ed.2d at 415, n. 15.

■ Defendants urge, however, that Title VII is prospective rather than retrospective, citing *Teamsters* and *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). They state that the discriminatory conduct, if any, was the segregated hiring, that the last such hiring took place in 1956, before the effective date of Title VII, and that therefore plaintiffs have not made out a prima facie case of post-Act discrimination. The Court disagrees. In the first place, we have here the situation described in *Teamsters* where pre-Act conduct has a discriminatory post-Act impact. Furthermore, we also are concerned with post-Act conduct in the alleged discriminatory refusal to transfer or promote plaintiffs to brakeman positions after the effective date of the Act.

In *McDonnell Douglas Corp., supra,* the Supreme Court found a prima facie case of discrimination by disparate treatment when the plaintiff showed:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677. The Court in *Teamsters* said that the criteria used in *McDonnell Douglas* did not purport to be "an inflexible formulation," and that the facts and criteria would vary from case to case. 431 U.S. at 357, 97 S.Ct. at 1865, 52 L.Ed.2d at 429.

The Court has examined the facts here. We note at the outset that since we are concerned with liability, not remedy, at this stage of the proceedings, the ability of an individual plaintiff to perform brakeman's duties is not at issue. Every plaintiff at one time performed braking duties. Certain braking positions required additional duties, but those plaintiffs who performed such additional duties testified that their prior experience enabled them to quickly learn such duties. Brakemen and train porters took the same Rules Examinations and student trips. We therefore hold, for purposes of establishing class-wide liability, that the plaintiff class was qualified for promotion or transfer to brakemen's positions, by virtue of past experience. See *Love v. Pullman Company,* 569 F.2d 1074 (10th Cir. 1978), where the Tenth Circuit Court of Appeals made a similar finding for porters-in-charge and train conductors.

Summing up the evidence of disparate treatment, in accordance with the summation in *McDonnell Douglas Corp.,* we find that no black brakeman was appointed on Santa Fe, outside the Silsbee, Texas Seniority District, until 1967 or 1968, well after the effective date of Title VII, and that the Santa Fe's appointment of black brakemen did not accelerate until approximately 1970–71. We further find that no member of the plaintiff class was transferred to a brakeman's position until 1968, well after the effective date of Title VII, and that most such transfers were not made until approximately 1971. From the testimony of the individual plaintiffs, we find a general willingness and desire on the part of the plaintiff class for transfer to brakeman's positions, beginning at least as of the effective date of Title VII. We find that that desire and willingness was in several instances communicated to the Santa Fe, and infer from the evidence before us that the defendant Santa Fe was aware that black chair car attendants and train porters as a class were desirous of becoming brakemen and conductors. We find that throughout the period between 1965 and the present, brakemen positions regularly became vacant and were filled, notwithstanding the general cutback in services and personnel undergone by the Santa Fe. We find that plaintiffs as a class were qualified to fill these positions. We find that plaintiffs as a class were not transferred to these positions, at least not for several years after the effective date of Title VII,[13] and that the positions were filled by persons who, if lacking prior braking experience, were not as qualified as plaintiffs.

These findings, in the Court's view, establish post-Act disparate treatment of plaintiffs as a class.

However, defendants urge that this action should be governed by *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) [*Evans*], rather than by *Teamsters,* and that *Evans* requires that we dismiss this action for failure to prove a continuing violation. *Evans* and *Teamsters* are companion cases; both were decided May 31, 1977. In *Evans,* a stewardess complained that her employer's previous no-marriage policy, under which she had been terminated and which was subsequently declared invalid, resulted in a denial to her, after her reinstatement, of her seniority accrued before she was terminated. She had not filed an EEOC complaint based on her termination. After her reinstatement, she filed an EEOC complaint alleging that the denial to her of past seniority was a continuing violation of Title VII. As to that, the Supreme Court said:

> Respondent emphasizes the fact that she has alleged a *continuing* violation. United's seniority system does indeed have a continuing impact on her pay and fringe benefits. But the emphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists. She has not alleged that the system discriminates against former female employees or that it treats former employees who were discharged for a discriminatory reason any differently than former employees who resigned or were discharged for a nondiscriminatory reason. In short, the system is neutral in its operation.

431 U.S. at 558, 97 S.Ct. at 1889, 52 L.Ed.2d at 578–79.

The Court also said that her wrongful termination, since it was not the basis for a timely charge with the EEOC, "is the legal equivalent of a discriminatory act which occurred before the statute [Title VII] was passed." *Id.*

In *Teamsters,* by contrast, the defendant employer had, on a class-wide basis, separated employees into white and minority jobs. Black and Spanish-surnamed employees were primarily assigned to the lower

---

**13.** We note, as defendants urge, that at the present, 50% of the active class members, or 8 of 16, are employed by the Santa Fe in brakeman, conductor, flagman, fireman, and engineer capacities. We also note as plaintiffs urge, that these employees did not assume these functions for several years after the passage of the Act, and that comparatively more class members never assumed comparable functions.

paying city driver positions, with some whites also so assigned, while only whites were assigned to line or over-the-road driver positions. Such a segregation occurred both pre- and post-Act. The Supreme Court found a systematic pattern or practice of discrimination in the segregation. As to the post-Act discriminatees, the Court ordered full "make whole" relief under *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). As to the pre-Act discriminatees, the Court found that they too had stated a cause of action under Title VII, because the seniority system used by the employer, by which seniority could not be transferred from city to line driver positions, perpetuated the effect of pre-Act discrimination. The Court used a disparate impact theory in discussing this issue, saying:

One kind of practice "fair in form, but discriminatory in operation" is that which perpetuates the effects of prior discrimination. As the Court held in *Griggs, supra* : "Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices."

401 U.S. at 430, 28 L.Ed.2d 158, 91 S.Ct. 849.

. . . [T]he seniority system in this case would seem to fall under the *Griggs* rationale. The heart of the system is its allocation of the choicest jobs, the greatest protection against layoffs, and other advantages to those employees who have been line drivers for the longest time. Where, because of the employer's prior intentional discrimination, the line driv-

ers with the longest tenure are without exception white, the advantages of the seniority system flow disproportionately to them and away from Negro and Spanish-surnamed employees who might now have enjoyed those advantages had not the employer discriminated before the passage of the Act. This disproportionate distribution of advantages does in a very real sense "operate to 'freeze' the status quo of prior discriminatory employment practices." *Ibid.*

*Teamsters,* 431 U.S. at 349, 97 S.Ct. at 1861, 52 L.Ed.2d at 424. The Supreme Court then went on to hold that though the seniority system had an adverse impact under *Griggs,* it was validated, in effect, by § 703(h) of Title VII, which exempts bona fide seniority systems from the operation of Title VII.

We are of the opinion and so hold that this case falls within the rationale of *Teamsters* rather than of *Evans.* The pre-Act discriminatory job segregation is the status quo which is frozen by the operation of the Santa Fe seniority system, under which seniority cannot be transferred from train porter to brakeman positions. Like *Teamsters,* the seniority system operates within a seniority division. See *Teamsters,* 431 U.S. at 342, 97 S.Ct. at 1858, 52 L.Ed.2d at 420 n. 26. The seniority system is not neutral in its operation, as was the case in *Evans. Teamsters* provides a cause of action to these plaintiffs on a theory of disparate impact of the seniority system.[14] Plaintiffs have made out a prima facie case of discrimination by disparate impact of the seniority system as it applies to them, since it operates to freeze them into the positions to which they were assigned by the employer's

---

**14.** We have examined cases cited by defendants in support of their assertion that *Evans* governs. The factual situations in several of these cases were more like *Evans* than *Teamsters,* and the cases are inapplicable. *DeGrafenreid v. General Motors Assembly Div.,* 558 F.2d 480 (8th Cir. 1977); *Martin v. Georgia-Pacific Corp.,* 568 F.2d 58 (8th Cir. 1977); *Freude v. Bell Telephone Company of Pennsylvania,* 438 F.Supp. 1059 (E.D.Pa.1977). In *Acha v. Beame,* 438 F.Supp. 70 (S.D.N.Y.1977), the court said that "*Teamsters* held that a Title VII

violation may not be premised upon discriminatory acts which occurred before the effective date of Title VII even though a present seniority system perpetuates the effect of pre-Title VII discrimination." 438 F.Supp. at 76. We disagree with the *Acha* court's interpretation of *Teamsters* ; our interpretation is that a Title VII violation may be so premised if the seniority system in question is not bona fide. In sum, we disagree with cases cited by defendant on this issue.

pre-Act discrimination, and since it operates to deprive them of the "allocation of the choicest jobs, the greatest protection against layoffs, and other advantages . ." *Teamsters,* 431 U.S. at 349, 97 S.Ct. at 1862, 52 L.Ed.2d at 424.

The evidence supports the plaintiffs' position of discrimination against them by defendants on the basis of race. Defendants seek to overcome plaintiffs' prima facie evidence on two theories. First, as to disparate impact, defendants assert that the seniority system is bona fide under § 703(h) of the Act. We disagree with this assertion. Second, as to disparate treatment, defendants assert that they were required to act as they did by provisions of labor contracts and the Railway Labor Act. Although these provide a reason for defendants' conduct, they do not excuse defendants' discrimination against individual plaintiffs, as we will hereafter outline. We will discuss defendants' theories seriatim.

## THE SENIORITY SYSTEM

42 U.S.C. § 2000e–2 [§ 703(h) of Title VII] provides in pertinent part:

> (h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . .

The Supreme Court dealt with the issue of what was meant by a bona fide seniority system in the *Teamsters* case. The Court rejected the view that a seniority system is invalid merely because it perpetuates the effects of past discrimination. In interpreting § 703(h) of Title VII, the Court stated:

> In sum, the unmistakable purpose of § 703(h) was to make clear that the routine application of a bona fide seniority system would not be unlawful under Title VII. As the legislative history shows, this was the intended result even where the employer's pre-Act discrimination resulted in whites having greater existing seniority rights than Negroes. Although a seniority system inevitably tends to perpetuate the effects of pre-Act discrimination in such cases, the congressional judgment was that Title VII should not outlaw the use of existing seniority lists and thereby destroy or water down the vested seniority rights of employees simply because their employer had engaged in discrimination prior to the passage of the Act.

431 U.S. at 352, 97 S.Ct. at 1863, 52 L.Ed.2d at 426. However, the Court recognized "the proposition that a seniority system that perpetuates the effects of pre-Act discrimination cannot be bona fide if an intent to discriminate entered into its very adoption." 431 U.S. at 346, 97 S.Ct. at 1860, 52 L.Ed.2d at 422 n. 28. The Court stated the criteria of a bona fide system as follows:

> The seniority system in this case is entirely bona fide. It applies equally to all races and ethnic groups. To the extent that it "locks" employees into non-line-driver jobs, it does so for all. The city drivers and servicemen who are discouraged from transferring to line-driver jobs are not all Negroes or Spanish-surnamed Americans; to the contrary, the overwhelming majority are white. The placing of line drivers in a separate bargaining unit from other employees is rational, in accord with the industry practice, and consistent with NLRB precedents. It is conceded that the seniority system did not have its genesis in racial discrimination, and that it was negotiated and has been maintained free from any illegal purpose. In these circumstances, the single fact that the system extends no retroactive seniority to pre-Act discriminatees does not make it unlawful.

431 U.S. at 355, 97 S.Ct. at 1865, 52 L.Ed.2d at 427–28.

The criteria have been considered by a few courts. In *Croker v. Boeing Co. (Vertol Div.),* 437 F.Supp. 1138, 1187 (E.D.Penn. 1977), the court said:

In this case, the plaintiff's evidence in no way establishes that Boeing Vertol's job family system is other than bona fide and facially neutral . . . The plaintiffs presented no evidence to show that creation of the job family system in 1956 was intended to preserve discriminatory patterns of employment. To the extent the restrictions of the job family system lock employees in undesirable jobs, the system affects blacks and whites in such jobs equally. Consequently, the job family system is not itself unlawful under Title VII.

In *Chrapliwy v. Uniroyal, Inc.*, 15 E.P.D. ¶ 7933 (N.D.Ind.1977), the court held a seniority system unlawful because it had its genesis in discrimination.

[B]efore the passage of the Act, Uniroyal " . . . kept segregated seniority lists according to sex . . ." [Citations omitted]. From 1965 through 1970 it was found that the A–B system of employment was only a disguise to the former segregated system. Finally, from 1970 to the present, this court found that the classification of certain jobs as those which "should not be performed by females" unlawfully discriminates on the basis of sex. In short, it is clear that the employment system at Uniroyal has had as its genesis discriminatory conduct both before and after passage of the Act.

The court in *Southbridge Plastics Division, Etc. v. Local 759, Etc.*, 565 F.2d 913, 916 (5th Cir. 1978) said "*Teamsters* holds that absent a showing of discriminatory purpose in a seniority system, that system is protected by § 703(h) from attack on other Title VII grounds."

One of the most detailed analyses of this issue is found in *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 351–52 (5th Cir. 1977):

As we read the *Teamsters* opinion, the issue whether there has been purposeful discrimination in connection with the establishment or continuation of a seniority system is integral to a determination that the system is or is not bona fide . . . The Court's analysis suggests that the totality of the circumstances in the development and maintenance of the system is relevant to examining that issue . . In *Teamsters* the Court focused on four factors:

1) whether the seniority system operates to discourage all employees equally from transferring between seniority units;

2) whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice);

3) whether the seniority system had its genesis in racial discrimination; and

4) whether the system was negotiated and has been maintained free from any illegal purpose.

The Court analyzed the context in which the seniority system developed. In discussing the relationship of seniority units to bargaining units, the Court quoted a National Labor Relations Board opinion that emphasized the rationality of separate bargaining units in the case of over-the-road and city drivers "where they are shown to be clearly defined, homogeneous, and functionally distinct groups with separate interests." [431 U.S. at 356, 97 S.Ct. at 1865, 52 L.Ed.2d at 428 n. 42]. Thus, the facts of a particular seniority unit are critical to a determination whether the system is bona fide; and a case-by-case analysis of seniority systems in light of section 703(h) is necessary.

The *Stockham Valves* court expressed dissatisfaction with the district court's finding that the seniority system was bona fide. The appellate court directed the lower court on remand to pay particular attention to the facts indicating that the seniority system had its genesis and was negotiated and maintained in discriminatory conditions and that the seniority units did not reflect existing separate and distinct bargaining units.

We have analyzed the seniority system in this case according to the criteria as listed in *Teamsters* and analyzed by *Stockham Valves,* and conclude that the seniority system is not bona fide.

Since for the most part conductors achieve that position in a progression from a brakeman position, our main concern is with the seniority system for brakemen, and our discussion will center around that system. Brakeman seniority begins as of the day the employee is qualified as a brakeman, and is accumulated within a seniority district and is not transferable from one seniority district to another, nor is seniority in another craft transferable to a brakeman position, except that a conductor continues to accumulate brakeman as well as conductor seniority. It is important that we distinguish between this seniority system *per se* and the segregation of employees into different crafts. That segregation is the deliberate historic exclusion of black men from the trainmen crafts of brakeman and conductor. *Teamsters* makes it clear that the brakeman seniority system is not unlawful under § 703(h) merely because it perpetuates pre-Act exclusion and segregation. Our concern is with whether an intent to discriminate entered into the adoption and maintenance of the seniority system, not with whether an intent to discriminate entered into the segregation of employees. The four criteria listed in *Teamsters* must be applied to the seniority system.

First, the seniority system is neutral on its face and applies equally to all brakemen. No transferee to a brakeman position, black or white, would accrue seniority any differently than any other transferee. In this regard, we analyze the present operation of the seniority system, as did the *Teamsters* Court.

Second, the structure of separate crafts or bargaining units is rational, in accord with the industry practice, and consistent with Railway Labor Act [RLA] precedents. The crafts have been recognized by the federal government and its agencies. The separate crafts have separate certified bargaining representatives under the RLA, they are denominated as separate crafts by the National Mediation Board under the RLA, and they were recognized by the United States Government by Supplement No. 12 to General Order 27 in 1918. The

separate crafts are in accord with industry practice as the craft structure on the Santa Fe has existed in substantially the same form since the late 1800's and has existed on the other railway lines in the United States. At any rate, this Court cannot impose liability because of the structure of separate crafts, for the separation into two crafts by race is the very discrimination which the *Teamsters* Court said would not, standing alone, invalidate a seniority system.

■ We determine that the seniority system in question does not meet the third and fourth criteria. The seniority system had its genesis in racial discrimination and was created and maintained with illegal purpose. The defendants argue that the seniority system was first established in 1892 and that the position of train porter was not created until 1899, so the seniority system could not have had its genesis in racial discrimination against train porters. They argue that the seniority system has been in continuous effect in substantially the same, form from 1892 to the present time. Defendants assert that this historical evidence indicates that the seniority system was created and maintained to offer job security and economic protection. In the Court's opinion, this argument goes to the first factor in the *Teamsters* analysis, that the seniority system is neutral on its face. We have already held that it is neutral. We must look to other facts to determine the nature of the genesis and maintenance of the seniority system. The *Stockham Valves* court has considered this issue.

The seniority system at Stockham was adopted in a collective bargaining agreement in 1949, when segregation in the South was standard operating procedure. The history of the negotiations associated with Stockham's seniority system is clouded. Since 1967 the local union has sought major revisions in the departmental seniority system through contract negotiations with the defendant Stockham. In 1970 the union struck for five months seeking the company's agreement with its

proposals, including plant-wide seniority. Stockham's failure to go along with revisions in the seniority system must be evaluated in the context of the company's extensive unlawful employment practices during the period of the negotiations and its intransigent adherence to wide-spread segregated facilities at the plant, at least until 1974.

Here, we have a seniority system which was adopted and maintained during a period when segregation was standard operating procedure on the Santa Fe. The seniority system was created by collective bargaining at a time when there were no black brakemen and no white train porters, at a time when blacks as a class performed only the most menial tasks on the railroad. It would not be until 1918 that "colored men employed as firemen, trainmen, and switchmen [were] paid the same rate of wages as [were] paid white men in the same category," and that only by order of the United States Government. *See* note 4. The unions which maintained the seniority system through negotiations and collective bargaining with the Santa Fe had clauses in their Constitutions which limited membership to white males. This written prohibition of black membership lasted at least from the 1930's to the 1960's, and there were no blacks in the unions before the 1930's. Since blacks were not eligible for membership in the unions, they could not be employed as brakemen or conductors, and they could not be eligible for the economic protection of the seniority systems in question. It was not until 1950 that chair car attendants had a written seniority system which was established through collective bargaining with the Santa Fe, and the train porters never had a written seniority system at all. The seniority system was used by the unions to deprive blacks of their train porter positions.

In sum, we conclude and so hold that the seniority system had its genesis in racial discrimination and was created and maintained with illegal purpose, that it fails to meet the *Teamsters* test, and that it is not bona fide. It follows that liability may be imposed against the Santa Fe in favor of the plaintiff class members.

■ We also conclude that liability may be imposed against the UTU. 42 U.S.C. § 2000e–2 provides in pertinent part:

(c) It shall be an unlawful employment practice for a labor organization—

\* \* \* \* \* \*

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

There was no detailed analysis of this provision in *Teamsters.* The *Teamsters* Court said "[b]ecause the seniority system was protected by § 703(h), the union's conduct in agreeing to and maintaining the system did not violate Title VII." 431 U.S. at 356, 97 S.Ct. at 1865, 52 L.Ed.2d at 428. The courts which have considered the issue say that if the seniority system is not protected by § 703(h), there must be an additional determination of the union's role in agreeing to, maintaining, or otherwise ratifying the seniority system. See *James v. Stockham Valves & Fittings Co., supra; United States v. East Texas Motor Freight System,* 564 F.2d 179 (5th Cir. 1977). We have made such a determination and conclude that the UTU is properly liable. The UTU and its predecessors played a principal role in the creation and maintenance of the seniority systems through collective bargaining between themselves and the Santa Fe. There is no indication in the facts that this collective bargaining was at less than arms length or that Santa Fe controlled the resulting labor agreements, and thus the UTU and its predecessors were equally responsible for the resulting seniority system. In addition to their role in collective bargaining, the unions were also involved in some of the conduct which led the Court to conclude that the seniority system was invalid, most notably the creation of the Constitutions which excluded blacks from union membership. We conclude that the unions' role in creating, maintaining, and otherwise ratifying the seniority system was at least as great as Santa Fe's role, and that therefore liability is properly imposed upon the UTU under Title VII.

## POST–ACT DISCRIMINATION

We have stated that plaintiffs have made out a prima facie case of post-Act discrimination against them as a class under the standards of *McDonnell Douglas Corp. v. Green, supra.* Defendants may rebut this by meeting their burden "to articulate some legitimate, nondiscriminatory reason" for their conduct in not transferring and promoting plaintiffs. If defendants present the Court with such a reason, plaintiffs may show that defendants' stated reason for not transferring and promoting them was pretext. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 678 and 679. Defendants point to the Feb. 7 agreement as a legitimate nondiscriminatory reason for the Santa Fe's failure to unilaterally transfer the plaintiff class to other positions for which they were as a class qualified. The Court has analyzed the Feb. 7 agreement and agrees with defendants. We further find no pretext. However, we find that the Santa Fe may be liable to individual plaintiffs for a discriminatory refusal to transfer them in situations where the Feb. 7 agreement was not applicable.

■ The Feb. 7 agreement is legitimate. Congress has throughout the years created a number of structures and systems governing numerous facets of labor relations. One such structure, Title VII, is designed to prohibit and eliminate racial and other discrimination in employment, while the RLA is one of the structures designed to promote the orderly management of labor through collective bargaining. Both purposes are important, and neither statute repeals the other. The relation between the two kinds of employment statutes has been addressed in a number of cases. In *Southbridge Plastics, supra,* the employer brought an action pursuant to the Labor Management Relations Act [LMRA] seeking a declaratory judgment that a conciliation agreement it had entered into with the EEOC overrode any contradictory provisions contained in a collective bargaining agreement with the union; the union counterclaimed seeking arbitration. The district court found the conciliation binding; on appeal the Fifth Circuit reversed. In so doing, the court quoted with approval from *Myers v. Gilman Paper Corp.,* 544 F.2d 837 (5th Cir. 1977), amended and modified on other grounds, 556 F.2d 758 (5th Cir. 1977):

> We are reminded that while Title VII expresses an important national policy, it does not exist in a vacuum. Important policies also emanate from the NLRA [National Labor Relations Act], among them the principle that terms and conditions of employment are to be shaped by the employer and the exclusive bargaining representatives of its employees.

The same principles apply to the RLA as to the LMRA and the NLRA. See *United States v. St. Louis-San Francisco Railway Co.,* 52 F.R.D. 276 (E.D.Mo.1971); *Norman v. Missouri-Pacific Railroad Co.,* 414 F.2d 73 (8th Cir. 1969). The collective bargaining provisions of the RLA are not invalidated by Title VII.

It was the BSCP, the exclusive bargaining representative of plaintiffs, which entered into the Feb. 7 agreement which forbade the Santa Fe to unilaterally transfer employees covered by the agreement, which included most if not all of the plaintiff class members. The agreement is not discriminatory on its face, nor is there any evidence that the intent of the BSCP in entering into the agreement was discriminatory. On the contrary, the evidence is that the intent was to ensure that plaintiffs would not be arbitrarily deprived of their jobs by their employer. Furthermore, once it became apparent that certain employees covered by the Feb. 7 agreement were seeking transfers to other positions, the BSCP and the Santa Fe negotiated to extend, and did extend, the agreement to permit the transfer of qualified employees covered by the agreement without any loss by them of the protection of the Feb. 7 agreement. This collective bargaining is important under and is protected by the RLA. We refuse to find that Title VII required defendant Santa Fe to act in contravention of the agreement, and therefore hold that the Feb. 7 agreement is a legitimate nondiscriminatory reason for Santa Fe's failure to unilater-

ally transfer or promote the plaintiff class members to the brakeman positions for which they were as a class qualified. We further hold that the Santa Fe followed the terms of the agreement because it was required to by the RLA, and not as a pretext. In light of the protest by the BSCP of the voluntary transfer of two of its members, we believe that the BSCP, certified bargaining representative of the plaintiff class, would have vehemently protested any attempt by the Santa Fe to violate the Feb. 7 agreement. There is no pretext in such a situation.

However, there is testimony of discriminatory conduct by the Santa Fe in situations not covered by the Feb. 7 agreement. The Feb. 7 agreement did not prohibit any plaintiff from transferring to another position nor prohibit the Santa Fe from permitting such a voluntary transfer. It appears to the Court that the Santa Fe showed great reluctance to transfer or promote the black train porters and chair car attendants who affirmatively sought such transfer. The individual testimony of plaintiffs includes a number of instances where a plaintiff expressed interest in voluntary transfer to another position, only to be met by evasion, rejection, or refusal on the part of the Santa Fe, with a number of reasons given for refusal ranging from Award 19324 to the Feb. 7 agreement to the plaintiff's age to the plaintiff's lack of BRT membership to the seniority that the plaintiff would have to give up. In every case, the Santa Fe refused, directly or indirectly, to transfer or promote black chair car attendants and train porters. This conduct, being outside the Feb. 7 agreement, cannot be excused by it. The prima facie case of post-Act discrimination has not been rebutted as to this conduct of the Santa Fe. Therefore, those individual plaintiffs who suffered this post-Act discriminatory conduct have a basis of liability in addition to the invalidity of the seniority system. The Supreme Court in *Teamsters* affirmed the holding of *Franks v. Bowman Transportation Co., supra,* that "§ 703(h) does not bar the award of retroactive seniority to job applicants who seek relief from an employer's post-Act

hiring discrimination . . . ." and that "[p]ost-Act discriminatees . . . may obtain full 'make whole' relief, including retroactive seniority under *Franks v. Bowman, supra,* without attacking the legality of the seniority system as applied to them." 431 U.S. at 346, 97 S.Ct. at 1860, 52 L.Ed.2d at 422.

The UTU has no liability for post-Act discriminatory conduct, for it neither had nor exercised any hiring and transfer authority, and therefore did not engage in any employment conduct which affected plaintiffs.

## DAMAGES

As noted earlier, the parties agreed that the case be tried in two stages, a liability stage and a damage stage. Because we have found liability on the part of both Santa Fe and the UTU, the case will proceed to the damages stage. To expedite matters, we note the following:

Since Santa Fe has previously settled all claims for damages, back pay, and attorneys' fees with all plaintiffs, there will be no damages or attorneys' fees award against Santa Fe in favor of plaintiffs. Monetary relief and attorneys' fees may be awarded against the UTU, since it has not settled these claims with plaintiffs.

Retroactive seniority may be awarded to plaintiffs, and this remedy may be awarded against the Santa Fe, since the railroad remained a party for purposes of injunctive relief and seniority carryover. Seniority relief may also be awarded against the UTU. Retroactive seniority may not be awarded prior to the effective date of Title VII. *Teamsters, supra; Franks v. Bowman Transportation Co., supra.* *Teamsters* sets out standards under which individual plaintiffs will be eligible for an award of retroactive seniority. Only those plaintiffs who are still actively employed by the Santa Fe will benefit from an award of retroactive seniority.

We direct that counsel present to the Court within thirty days after receipt of this decision their proposed findings con-

cerning the manner in which the damage and equitable relief issues of the case should be ordered.

IT IS SO ORDERED.