Joe Vernon SEARS, an individual, in person and for all other persons similarly situated, Plaintiffs-Appellees and Cross-Appellants,

v.

Albert L. BENNETT, C. J. Skelton, Archie N. Jones, Forest D. Tollett, John W. Landrum, Lawson C. Spencer, Thomas H. White, Earlie Nash, Aubrey A. Robinson, Edward Rawlins, John W. Cole, Charles Majors, Jr., Jesse J. Smith, Paul H. Stewart, Jimmy E. Brown, Carl E. Chester, Ray E. Landrum, Raymond Wiley, Elgie Crow and Ellis Johnson; Criscel Kemp, A. M. Bennett, A. L. Woolfolk, T. C. Luckey and W. W. Seymour, Intervenors-Plaintiffs-Appellees and Cross-Appellants,

The BROTHERHOOD OF SLEEPING CAR PORTERS, Plaintiff-Appellee and Cross-Appellant,

v.

The ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, and United Transportation Union, successor to Brotherhood of Railway Trainmen, a labor organization, Defendants-Appellants and Cross-Appellees.

Nos. 78–1995, 78–1997 and 78–1998.

United States Court of Appeals, Tenth Circuit.

Argued March 13, 1980.

Decided March 11, 1981.

Rehearing Denied in No. 78–1995 May 11, 1981.

Terry G. Paup, and Lee H. Woodard of
Woodard, Blaylock, Hernandez, Pilgreen &
Roth, Wichita, Kan. (Chester I. Lewis of

Lewis, Davis & Mitchell, Wichita, Kan., with them, on brief), for plaintiffs-appellees and cross-appellants Joe Vernon Sears, et al.

Charles R. Judge, St. Louis, Mo. (William B. Smith of Dubail, Judge, Kilker, O'Leary & Smith, St. Louis, Mo., and E. Lee Kinch of Ratner, Mattox, Ratner, Ratner & Barnes, Wichita, Kan., with him, on brief), for defendant-appellant and cross-appellee United Transportation Union.

Shelley J. Venick, Chicago, Ill. (Ronald A. Lane, Chicago, Ill., J. B. Reeves, Roth A. Gatewood and Thomas R. Conklin, Topeka, Kan., with her, on brief), for defendant-appellant and cross-appellee Atchison, Topeka & Santa Fe Railway Co.

William H. Ng, E.E.O.C., Washington, D. C. (Issie L. Jenkins, Acting Gen. Counsel, Joseph T. Eddins, Associate Gen. Counsel, and Beatrice Rosenberg, Asst. Gen. Counsel, Washington, D. C., with him, on brief), for amicus curiae Equal Employment Opportunity Commission.

Before SETH, Chief Judge, and HOLLOWAY and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

The Atchison, Topeka & Santa Fe Railway Company (Santa Fe) and the United Transportation Union (UTU)[1] appeal from a judgment holding that they violated the Civil Rights Act of 1964 (Title VII or the Act), 42 U.S.C. § 2000e et seq., by perpetuating the effects of prior discrimination in a nonbona fide seniority system. Plaintiffs—black train porters, chair car attendants and their union—cross-appeal regarding elements of the back pay formula and showings required of individual class members by the court. The Equal Employment Opportunity Commission (EEOC) appeared as amicus on plaintiffs' behalf.

Plaintiff Joe Vernon Sears filed complaints against Santa Fe and UTU with the Kansas Commission on Civil Rights and the EEOC on March 8, 1966, and October 4, 1966, respectively, alleging that Santa Fe and the UTU had denied and were continuing to deny him and other black employees their rights under Title VII because of their race. On October 7, 1972, the EEOC notified Sears of his right to sue defendants; he filed suit in district court the following month on behalf of himself and others similarly situated. The district court certified the suit under Fed.R.Civ.P. 23(b)(2) and (c) as a class action on behalf of Sears and all other black train porters employed by Santa Fe in any capacity from July 2, 1965 to the time of class certification. The Brotherhood of Sleeping Car Porters (BSCP)[2] was also admitted as a plaintiff. Santa Fe settled all claims for damages, back pay, and attorneys' fees with plaintiffs before trial, but remained a party in the suit for purposes of injunctive relief and seniority considerations.

With the parties' agreement, the court tried the case in phases and reported its findings in two decisions, one regarding liability, reported at 454 F.Supp. 158 (D.Kan. 1978), and the other dealing with damages (unpublished). The liability phase was tried by means of a joint presentation of stipulated facts, subject to objections of relevancy and materiality. The parties submitted briefs on the issue of damages, after which the court determined a method of arriving at back pay and seniority rights accruing to each member of the subclasses. It did not make individual awards, but retained jurisdiction to do so, finding it unnecessary to appoint a special master for the computation of back pay awards.

The issues on appeal are (1) whether the seniority system was bona fide within

---

1. UTU is the successor by merger to The Brotherhood of Railroad Trainmen (BRT) and the Order of Railroad Conductors and Brakemen (ORC&B). UTU and its predecessors have represented brakemen and conductors of the Santa Fe as collective bargaining agents since at least 1892.

2. The BSCP merged with the "System Division" of the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees effective April 1, 1978. The trial court recognized the change in party status, but continued to refer to the union as the BSCP, as we do here. See 454 F.Supp. at 160.

§ 703(h) of the Act; (2) whether liability may be imposed on UTU for the impact created by the seniority system agreed to by UTU and Santa Fe; and (3) whether the court abused its discretion in its formulation of damages.

Some general background facts are in order. Train runs on the Santa Fe traditionally included passenger trains, through freights, local freights, and mixed passenger and freight trains. The train crews on local and through freight trains consisted of a conductor, head-end brakeman, rear-end brakeman, engineer and fireman. Santa Fe created the position of train porter in 1899. Train porters performed the duties of head-end brakemen on passenger trains and also attended to passengers and took care of the interior condition of passenger cars in their custody. Porters and head-end and rear-end brakemen on passenger trains received the same mileage rate or hourly rate from 1918 until termination of the job of train porter in 1975. However, brakemen received additional compensation not paid to train porters, such as pay for delays. Thus, the total wages paid to a passenger brakeman were higher than those paid to a train porter. Most passenger trains also carried chair car attendants, non-operational personnel who attended to passengers' needs and cleaned the interior of the cars. They performed no braking duties. Train porters and chair car attendants were always black males. Between 1918 and 1959, the entry level job with the Santa Fe for a black man was the position of chair car attendant. Chair car attendants could qualify for the position of a train porter by taking a rules examination, passing a physical examination, and completing student trips on passenger trains. The newly qualified train porter would continue to work as a chair car attendant and would work as a porter when called from the extra board, a list of qualified porters who were not assigned to a regular run. With sufficient seniority, he could obtain a regular job as a porter.

The entry level for a nonblack man was the brakeman position. A white man could qualify for the brakeman position by taking a rules examination, passing a physical ex-

amination, and completing student trips on local freight trains. The rules examination for a brakeman applicant and the administration thereof were the same as for train porters. Before 1960, a new hire started as an extra on all of the types of trains run by Santa Fe. After accumulating sufficient seniority, a brakeman could obtain a regular freight braking job. Generally a brakeman needed substantial seniority to obtain a regular braking job on passenger trains. Some brakemen never sought passenger work. A brakeman on a passenger train could return to freight service by exercising his seniority rights.

The Santa Fe has always maintained and published seniority rosters for each craft for each district or geographic area. An individual's seniority date is the earliest date of continuous service in a particular craft within a particular district. An employee's seniority date determines promotion opportunities as well as his right to protect work within his craft and district. Seniority is not transferable from one district to another or from one craft to another. The first known contract containing seniority provisions was an 1892 agreement between Santa Fe and predecessors to UTU. In 1960, the seniority rosters of brakemen and yardmen were combined, giving them dual rights. After that date, a new hire was given a seniority date applicable to yard and road service.

A UTU predecessor, the Brotherhood of Railroad Trainmen (BRT), made several attempts to transfer braking duties from black train porters to white brakemen. BRT protested that the use of porters on passenger trains to perform the duties of head-end brakemen violated the contracts between the BRT and Santa Fe providing for the seniority rights and duties of brakemen. In 1959, the National Railroad Adjustment Board issued Award 19324, holding that only train porters holding a seniority date prior to April 20, 1942, could perform head-end braking duties. All train porters with a later seniority date were demoted to chair car attendants and could no longer perform braking duties.

In the instant case, the district court divided the plaintiff class into two subclasses: (1) those who were serving as train porters in 1965 when Title VII became effective and (2) those who had been reclassified as chair car attendants under Award 19324 and were serving in that capacity on July 2, 1965. The first group is composed of employees who had a seniority date earlier than April 20, 1942, and thus were allowed to continue in the porter position after Award 19324. Those in the second group once served as porters but had a seniority date after April 20, 1942, and thus were precluded from serving as train porters after 1959.

The district court held that both Santa Fe and the UTU engaged in a pre-Act system-wide policy and pattern of discrimination against black employees, that this discrimination was perpetuated by the seniority system agreed to by both defendants, and that disparate impact created by the seniority system was not immunized by the § 703(h) exemption for bona fide seniority systems. The court also found that Santa Fe violated the Act by refusing to promote class members after the effective date of Title VII. The court imposed liability on UTU as well as on Santa Fe for the disparate impact of the seniority system on the porter subclass, reasoning that the union's role in creating and maintaining the seniority system was at least as great as the employer's. Although both defendants were deemed responsible for this discrimination, UTU alone was held liable for monetary damages and attorneys' fees because Santa Fe had settled with plaintiffs. (Damages due each class member were to be reduced by the amount received from the Santa Fe settlement.) Santa Fe alone was held liable with regard to the discrimination against the chair car attendant subclass because the court found UTU engaged in no post-Act discriminatory conduct against them. The district court noted that only those plaintiffs still actively employed would benefit from a seniority award; it has not determined whether any plaintiffs are so employed.

## I. LIABILITY

██ At the outset, we note that in a case tried on stipulated facts, as this one was, in which the observation of witnesses played no role in its findings, we evaluate and draw conclusions from the evidence without the deference ordinarily afforded a trial court's findings of fact. *Mid-Continent Casualty Co. v. Everett,* 340 F.2d 65, 70 (10th Cir. 1965). While the scope of our review is enlarged somewhat in such a case, the ordinary standard of review still inheres: findings of the trial court are set aside only if they are clearly erroneous. *Id.*

Plaintiffs claim that Santa Fe and UTU violated the Civil Rights Act of 1964 by perpetuating the effects of prior discriminatory conduct of employing blacks as train porters and chair car attendants and excluding them from employment opportunities in the higher paying jobs of brakeman and conductor. Section 703(a) of Title VII, 42 U.S.C. § 2000e–2(a) provides in pertinent part:

"(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

██ The district court held that plaintiffs met their burden of showing that racial discrimination was standard operating procedure for Santa Fe and UTU and its predecessors for nearly a century, carrying over past the effective date of Title VII through operation of the seniority system.

See *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977).

"The evidence is clear. For almost all the years of the Twentieth Century to date, there have been no black brakemen, no white train porters. Both positions required the performance of substantially similar braking duties; the difference in additional duties is insignificant compared to the similarity of total duties. The fact is that employees performing essentially the same duties were segregated into job category by race, and the evidence is overwhelming that such segregation was intentional. This is disparate treatment."

454 F.Supp. at 174. We will not restate the evidence supporting this conclusion. It is well summarized in the trial court's opinion, 454 F.Supp. at 162–73, and the findings are amply supported by the record.

Santa Fe apparently concedes its liability for post-Act discriminatory hiring practices. Both Santa Fe and UTU argue that the only wrong involved here is merely discriminatory hiring practices. We disagree. Consideration of the validity of the seniority system is crucial to establishment of seniority rights of class members and to the liability of UTU for damages and back pay. The validity of the seniority system is at issue because that system perpetuated past discrimination. Both Santa Fe and UTU argue that the seniority system is valid under the rationale of *Teamsters*.

### A. The Seniority System

The Civil Rights Act prohibits practices or procedures that "operate to 'freeze' the status quo of prior discriminatory employment practices." *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). The district court found that the seniority system agreed to

by Santa Fe and UTU perpetuates the effects of pre-Act discrimination and thus violates Title VII by creating a disparate impact disfavoring plaintiffs. 454 F.Supp. at 174.

The operation of the seniority system complained of in this case is similar to that at issue in *Teamsters*. There minority drivers proved that a carrier of motor freights had engaged in a pre-Act pattern of discrimination by hiring minority applicants in serviceman or local driver positions rather than in the higher paying (long distance) line driver positions. The effects of this pre-Act discriminatory hiring were perpetuated by the seniority system embodied in the collective bargaining agreement between the drivers' union and the employer, which required employees who transferred to line driver positions to forfeit seniority accumulated in a serviceman or local driver position. The Supreme Court found the seniority system created a disparate impact and would have been violative of the Civil Rights Act but for § 703(h) of the Act which exempts bona fide seniority systems from the operation of the Act under certain circumstances.[3] The Santa Fe system requires the same sort of seniority forfeiture by porters and chair car attendants transferring to a brakeman position, and thus creates a disparate impact by perpetuating the effects of pre-Act discrimination. *See Teamsters*, 431 U.S. at 349, 97 S.Ct. at 1861; *Griggs v. Duke Power Co.*, 401 U.S. 424, 429, 91 S.Ct. 849, 852, 28 L.Ed.2d 158 (1971). Thus, the crucial question in the instant case is whether the seniority system at issue is immunized by § 703(h).

In *Teamsters*, the Supreme Court reasoned that in passing § 703(h) Congress intended "to make clear that the routine

---

**3.** In relevant part, § 703(h), 42 U.S.C. § 2000e–2(h) provides:

"Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a *bona fide* seniority

or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, *provided that such differences are not the result of an intention to discriminate* because of race, color, religion, sex, or national origin . . . ."
(Emphasis added.)

application of a bona fide seniority system[4] would not be unlawful under Title VII," despite the fact that it perpetuates the effects of pre-Act discrimination. 431 U.S. at 352, 97 S.Ct. at 1863 (footnote added). The Court recognized that the proviso to § 703(h) requires that any differences in treatment created by the system must not be the "result of an intention to discriminate because of race ... or national origin." *Id.* at 353, 97 S.Ct. at 1863. In considering the *Teamsters* seniority system, the Court indicated some of the circumstances that influenced its determination that the bona fides required by § 703(h) were met in that case.

"The seniority system in this litigation is entirely bona fide. It applies equally to all races and ethnic groups. To the extent that it 'locks' employees into non-line-driver jobs, it does so for all. The city drivers and servicemen who are discouraged from transferring to line-driver jobs are not all Negroes or Spanish-surnamed Americans; to the contrary, the overwhelming majority are white. The placing of line drivers in a separate bargaining unit from other employees is rational, in accord with the industry practice, and consistent with National Labor Relation Board precedents. It is conceded that the seniority system did not have its genesis in racial discrimination, and that it was negotiated and has been maintained free from any illegal purpose. In these circumstances, the single fact that the system extends no retroactive seniority to pre-Act discriminatees does not make it unlawful."

---

**4.** The court used the term bona fide seniority system to refer to a system within the § 703(h) exemption.

**5.** In *James v. Stockham Valves and Fittings Co.*, 559 F.2d 310 (5th Cir. 1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 787 (1978), the Fifth Circuit interpreted the statement of criteria from *Teamsters.*

"As we read the *Teamsters* opinion, the issue whether there has been purposeful discrimination in connection with the establishment or continuation of a seniority system is integral to a determination that the system is or is not bona fide ... The Court's analysis suggests that the totality of the circumstances in the development and maintenance of

431 U.S. at 355–56, 97 S.Ct. at 1864–65 (footnote omitted).

Relying on a Fifth Circuit distillation[5] of factors from the foregoing *Teamsters* statement, the district court held that Santa Fe's seniority system met the first two factors considered by the Supreme Court but failed to meet the final two requirements because the system "had its genesis in racial discrimination and was created and maintained with illegal purpose." 454 F.Supp. at 179. Both defendants urge us to reverse the district court's holding of liability on the ground that the system is bona fide under *Teamsters.* While plaintiffs do not challenge the court's liability holding on appeal, they contend that, unlike the *Teamsters* system, this one was not rational and did not apply equally to the races involved as required by the *Teamsters* test. We agree with the district court's ultimate determination that the system is not within the protection of section 703(h), but our analysis differs somewhat from that of the district court.

Although the district court noted that the seniority system was not neutral in operation, it found the seniority system met the first factor of *Teamsters* because it is neutral on its face, applying equally to all individuals. "No transferee to a brakeman position, black or white, would accrue seniority any differently than any other transferee." 454 F.Supp. at 179. The Supreme Court's explanation of the first factor in *Teamsters* focused on the impact of

the system is relevant to examining that issue ... In *Teamsters* the Court focused on four factors:

1) whether the seniority system operates to discourage all employees equally from transferring between seniority units;

2) whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice);

3) whether the seniority system had its genesis in racial discrimination; and

4) whether the system was negotiated and has been maintained free from any illegal purpose."

*Id.* at 351–52, 97 S.Ct. at 1862–63.

the system on the racial groups involved, indicating that facial neutrality of operation of the system is not determinative. The entire statement of the first factor considered by the Court follows:

"The seniority system in this litigation is entirely bona fide. It applies equally to all races and ethnic groups. To the extent that it 'locks' employees into non-line-driver jobs, it does so for all. *The city drivers and servicemen who are discouraged from transferring to line-driver jobs are not all Negroes or Spanish-surnamed Americans; to the contrary, the overwhelming majority are white....*"

431 U.S. at 355–56, 97 S.Ct. at 1864–65 (emphasis added). In *Teamsters*, the Supreme Court assessed the racial composition of the city drivers and servicemen. We believe the comparable group for consideration here is that portion of the train crew performing related jobs, composed of conductors, brakemen, porters, chair car attendants and switchmen. In 1960, the seniority lists of brakemen and switchmen were merged or "dualized" to allow movement between these "similar" crafts. This merger allowed all members of this operational crew—except porters and chair car attendants—to transfer without a loss of seniority. In dramatic contrast to *Teamsters, all* the employees in the relevant group "who are discouraged from transferring" are blacks. Thus, the seniority system here fails to meet the first criterion of *Teamsters.*

In regard to the second factor, the district court determined that the structure of separate crafts for porters, chair car attendants, and brakemen was "rational, in accord with industry practice, and consistent with Railway Labor Act [RLA] precedents," 454 F.Supp. at 179. The craft units have been recognized by the Railway Labor Board and were obviously in accord with prevailing industry practice. We believe the creation of the porter and chair car attendant crafts was not rational because they were drawn along racial lines. The district court stated that the *Teamsters* court refused to invalidate a system which involved "the separation into two crafts by race." *Id.* But the *Teamsters* craft units were not drawn totally on racial lines. The majority of Teamsters drivers in all crafts were white; here 100% of all members of the porter craft are black. Second, two of the crafts, those of porter and brakeman, under consideration here performed the same functions.[6] Finally, we cannot agree with Santa Fe's argument that the Supreme Court recognized the rationality of the craft designations in *Brotherhood of Railroad Trainmen v. Howard,* 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952). That issue was not before the Court in *Howard.*[7]

The third factor mentioned in *Teamsters* is whether the seniority system had its genesis in racial discrimination. The brakemen's system was established in 1892, before the creation of the porter or chair car attendant crafts, in a "period when segregation was the standard operation procedure on the Santa Fe." 454 F.Supp. at 180.

**6.** While defendants now contend that the positions are not substantially similar, the basis for UTU's protests before the Railway Labor Board was that the porters were performing duties given to brakemen by the seniority agreement, *i. e.,* that the two crafts performed the same function. *See also Brotherhood of Railroad Trainmen v. Howard,* 343 U.S. 768, 771 n.3, 72 S.Ct. 1022, 1024 n.3, 96 L.Ed. 1283 (1952) quoted *infra* note 11.

**7.** Rather than ratifying the craft designations, the *Howard* Court implied the specious nature of the distinctions between the porter and brakeman crafts.

"Since the Brotherhood has discriminated against 'train porters' instead of minority members of its own 'craft,' it is argued that the Brotherhood owed no duty at all to refrain from using its statutory bargaining power so as to abolish the jobs of the colored porters and drive them from the railroads....

"As previously noted, these train porters are threatened with loss of their jobs because they are not white and for no other reason. The job they did hold under its old name would be abolished by the agreement; their color alone would disqualify them for the old job under its new name."

343 U.S. 768, 773, 72 S.Ct. 1022, 1025, 96 L.Ed. 1283 (1952).

In this context the seniority system for brakemen may have originated without conscious regard to race, but the same may not be said of the later establishment of the black-only crafts.

The fourth and final factor is whether the system was maintained for a discriminatory purpose. The system was used as a sword by the union in its efforts to take plaintiffs' jobs from them. 454 F.Supp. at 180. Black men were not accepted as members in the brakemen's union. Beginning not later than 1920, the union sought the transfer of braking duties from black train porters to white brakemen, protesting that negotiated contracts between the BRT and Santa Fe provided that the brakeman with the highest seniority would perform the next available braking duty, and that by allowing porters to perform braking functions Santa Fe was violating those agreements. Ultimately, the National Railroad Adjustment Board held that only those train porters holding a seniority date prior to April 20, 1942, could perform front-end braking duties. All train porters with seniority dates subsequent to April 20, 1942, were demoted to chair car attendants. The evidence clearly supports the holding that the system was maintained for a racially discriminatory purpose.

The existence of an all-white work force, even if created through discrimination, will not invalidate a seniority system protected under section 703(h). *See Teamsters*, 431 U.S. at 350–51, 97 S.Ct. at 1862–63. But protection of that section is not extended to a system, such as this one, which creates employment differences with the intention of discriminating because of race. In sum, the brakeman's seniority system does not fall within the exception created by Congress in section 703(h) because

it does not apply equally to all races, because it was not based on a rational craft delineation, and because it was maintained with the purpose of discriminating against black employees. As the Supreme Court recognized in *Teamsters*, liability is imposed on those responsible for a seniority system that is not protected by section 703(h) and that perpetuates the effects of Pre-Act discrimination. 431 U.S. at 349–50, 97 S.Ct. at 1861–62. In this case, Santa Fe is clearly liable. Since it has settled monetary claims, however, Santa Fe is affected by this holding only with respect to its future practices and the seniority relief granted to members of the subclasses still working for it.

### B. Union's Liability

The district court predicated UTU's liability on § 703(c) of Title VII, which provides, in pertinent part: "It shall be an unlawful employment practice for a labor organization . . . (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section." 42 U.S.C. § 2000e–2(c). UTU contends that even if the seniority system is invalid under section 703(h), the union cannot be held liable. The essence of its arguments can be summarized as follows: (1) UTU exercised no hiring or transfer authority; (2) UTU did not influence Santa Fe's hiring policies and used only lawful means to protest the assignment of braking tasks to porters; (3) UTU owed plaintiffs no duty of representation.

At trial, the parties stipulated that UTU had no hiring authority. 454 F.Supp. at 167. UTU contends that its lack of legal hiring or transfer authority is determinative.[8] Obviously, lack of authority to hire or transfer is not determinative on the issue

---

8. On this point, UTU stated in its brief that it is "inconceivable that UTU could be held liable for pre-Act discrimination while it was properly found to be not liable for post-Act discrimination." UTU Brief 14. The district court stated that "UTU has no liability for post-Act discriminatory conduct, for it neither had nor exercised any hiring and transfer authority, and therefore did not engage in any employment conduct which affected plaintiffs." 454

F.Supp. at 182. We believe that the court meant merely that plaintiffs had failed to make out a case of post-Act discriminatory conduct. The statement obviously cannot mean that liability is imposed under Title VII only for discriminatory hiring practices. A few pages earlier the court found UTU liable under § 703(c) for the disparate impact created by Santa Fe's pre-Act discrimination though the union clearly had no hiring authority.

whether the union violated § 703(c). That section proscribes the indirect role of encouraging discrimination by an employer, by making it an unlawful hiring practice for unions to "cause or attempt to cause an employer to discriminate."

UTU argues that because the railroad was not a closed shop until 1965, its white membership requirement (removed in 1960) did not deter blacks from applying for brakeman positions or influence Santa Fe's hiring policies. Separately, UTU contends that its efforts to take braking duties from porters were simply "lawful resort" to administrative agencies to regain the disputed head-end braking duties, claiming that "[n]owhere in the record is there anything to support even an inference that on the Santa Fe UTU demanded that blacks be hired only as Chair Car Attendants or Train Porters." UTU Brief 22.

We find these arguments unpersuasive. The net effect of UTU's actions was that it gained control of most braking work, and it allocated the work to its white members only. We agree with the district court's holdings that UTU's role in creating the invalid seniority system was at least as great as Santa Fe's, 454 F.Supp. at 180, and that the discrimination perpetuated by the seniority system "was approved by, acquiesced in, and maintained and demanded by the 'white' unions." 454 F.Supp. at 174. A union's role as a party to a collective bargaining agreement may be sufficient to impose back pay liability on the union. *See Kaplan v. International Alliance of Theatrical and Stage Employees*, 525 F.2d 1354,

1360 (9th Cir. 1975); *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1381 (5th Cir. 1974). We hold that these actions were at least an attempt to cause the employer to discriminate against plaintiffs and, therefore, violated § 703(c).[9]

The fact that UTU was the bargaining agent for brakemen and not for porters does not change the result. While the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*, empowers unions to act as the exclusive bargaining agent for those it represents, it in no way immunizes a union's discrimination. Bargaining agents may not use their power to discriminate against the non-union or minority members of the craft they represent, *Steele v. Louisville & Nashville RR.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), or against minority employees in other craft designations. *Brotherhood of Railroad Trainmen v. Howard*, 343 U.S. 768, 775, 72 S.Ct. 1022, 1026, 96 L.Ed. 1283 (1952).[10] Moreover, liability here is premised on the Civil Rights Act not on the RLA. While Title VII did not invalidate the RLA, it proscribes discriminatory conduct not dealt with and not immunized by the RLA.

Thus, the union's role in freezing the status quo of a prior discriminatory seniority system, not immunized under section 703(h), renders it liable to those upon whom the seniority system had an adverse impact.

The trial court gave relief against the union only to the train porter subclass, denying relief to the chair car attendants. It reasoned that the impact of the seniority

---

9. It is unnecessary for us to find that the union entered the agreement with the intention of discriminating. The action of agreeing to the seniority system was nonaccidental and deliberate. We conclude that the union "intentionally engag[ed] in an unlawful employment practice" within the meaning of 42 U.S.C. § 2000e–5(g). *See Jones v. Lee Way Motor Freight, Inc.*, 431 F.2d 245, 250 (10th Cir. 1970).

10. The facts of *Howard* are strikingly similar to those of the instant case. By threatening a strike, the Brotherhood of Railroad Trainmen forced a railroad to agree not to permit train porters to perform any braking duties. 343 U.S. at 771, 72 S.Ct. at 1024. Although the

agreement, like the seniority provisions obtained by the same union in the present case, "did not in express words compel the discharge of 'train porters,' the economic unsoundness of keeping them after transfer of their 'brakeman' functions made complete abolition of the 'train porter' group inevitable." *Id.* Although the RLA lacks specific references to discriminatory conduct or the broad equitable powers of Title VII, the Supreme Court held the RLA prohibits the "bargaining agents it authorizes from using their position and power to destroy colored workers' jobs in order to bestow them on white workers." *Id.* at 774, 72 S.Ct. at 1025.

system "is upon those class members who performed braking duties but did not accrue braking seniority, *i. e.*, persons employed as train porters." It also stated that because plaintiffs employed as chair car attendants at the effective date of the Act "were not performing braking duties, they had no right to accumulate brakeman seniority and the invalid seniority system had no discriminatory impact upon them." Plaintiffs argue that all class members, porters and chair car attendants alike, suffered the same disparate impact of a restriction of employment opportunities and thus all are entitled to the same relief. Defendants support the district court's denial of recovery to chair car attendants, but assert that the award to the porter subclass was improper because the porter position was not substantially similar to the brakeman position.

 We agree with the district court that the union is liable in damages to the porters. Notwithstanding defendants' assertions, the porters were Santa Fe employees performing braking functions essentially like the nonblack brakemen.[11] These porters were not denied the job, instead they were denied the title of brakeman, extra pay accruing to that position, and the opportunity for further employment advancement. These results were perpetuated into the post-Act period by the invalid seniority system. The union is liable because it helped perpetuate this discrimination. *See Teamsters*, 431 U.S. at 349, 97 S.Ct. at 1861. If the craft distinction between porters and brakemen is ignored as invalid, the union has a duty not to use its power to discriminate against non-union or minority members of the craft. *Steele v. Louisville & Nashville Ry.*, 323 U.S. at 192, 65 S.Ct. at 226. If the craft distinctions are credited, the union, nevertheless, has a duty

not to discriminate against minority employees in the other craft designations. *See Brotherhood of Railroad Trainmen v. Howard*, 343 U.S. at 774, 72 S.Ct. at 1025.

 The chair car attendant's position is different in some respects, but we hold that UTU is liable to this subclass also. The difference is that as of the effective date of Title VII these men were not performing braking functions. The union argues that the chair car attendants were a separate craft, not represented by UTU or its predecessors under the craft-type organization in effect in the railroad industry. All of this is true, but the chair car attendants were victims of the invalid seniority system, in the perpetuation of which the union played a major role. During all of the pre-Title VII years the entry level job on the Santa Fe for a black outside the Silsbee, Texas, district was as chair car attendant. Until 1959 a black could work up to the porter position, where he could perform a brakeman's functions and receive somewhat comparable pay. The entry level job for a white was as brakeman. The union helped perpetuate the discrimination by imposing all white membership rules until 1960, and by seeking and succeeding in obtaining demotion for these class members from the position of porter to chair car attendant. All members of this subclass qualified and served as train porters until demoted in 1959. After 1960, brakemen and switchmen operated under merged seniority rosters. We understand they could be promoted to conductor and could work in that position without losing seniority as brakemen-switchmen. But members of the subclass of chair car attendants were frozen into their position. No one could be promoted to porter. There was no merger of porter or former porter chair car attendants seniority

---

11. The positions of porter and brakeman were compared to each other by the Supreme Court in *Brotherhood of Railroad Trainmen v. Howard*, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952).

"In addition to doing all the work done by ordinary brakemen, train porters have been required to sweep the coaches and assist passengers to get on and off the trains. As

the Court of Appeals noted, 'These aisle-sweeping and passenger-assisting tasks, however, are simply minor and incidental, occupying only, as the record shows, approximately five per cent of a train porter's time.'"

*Id.* at 771 n.3, 72 S.Ct. at 1024 n.3 (quoting *Howard v. St. Louis-San Francisco Ry. Co.*, 191 F.2d 442, 444 (8th Cir. 1951)).

rosters with those of the brakemen-switchmen, nor any right, as we understand, to retain seniority in the old job if a brakeman's position was sought. This situation continued in the post-Act period under contracts negotiated between UTU and Santa Fe. The system discouraged application for the better paying brakemen's positions.

*Teamsters* said

"One kind of practice 'fair in form, but discriminatory in operation' is that which perpetuates the effects of prior discrimination. As the Court held in *Griggs*: 'Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze" the status quo of prior discriminatory employment practices.' 401 U.S., at 430 [91 S.Ct. at 853].

Were it not for § 703(h), the seniority system in this case would seem to fall under the *Griggs* rationale. The heart of the system is its allocation of the choicest jobs, the greatest protection against layoffs, and other advantages to those employees who have been line drivers for the longest time. Where, because of the employer's prior intentional discrimination, the line drivers with the longest tenure are without exception white, the advantages of the seniority system flow disproportionately to them and away from Negro and Spanish-surnamed employees who might by now have enjoyed those advantages had not the employer discriminated before the passage of the Act. This disproportionate distribution of advantages does in a very real sense 'operate to "freeze" the status quo of prior discriminatory employment practices.' "

431 U.S. at 349–50, 97 S.Ct. at 1861–62 (footnote omitted).

■ Labor unions as well as employers may be held liable for the perpetuation of

prior discrimination through their role in negotiating collective bargaining agreements. *E. g., Kaplan v. International Alliance of Theatrical and Stage Employees*, 525 F.2d 1354 (9th Cir. 1975); *Macklin v. Spector Freight Systems, Inc.*, 478 F.2d 979 (D.C.Cir.1973). Thus the trial court erred in not holding UTU liable in damages to the chair car attendant subclass.

## II. REMEDIES

### A. *Train Porters*

The district court held that "all members of this [porter] subclass are presumptively entitled to accrue brakeman's seniority and pay as of July 2, 1965," the effective date of the Act.[12] The court set the following formula to be used in figuring UTU's liability for back pay due each porter:

"1) Determine the average compensation paid a white brakeman with seniority as of July 2, 1965, until the date the plaintiff could no longer work.

2) Subtract the actual compensation paid the class member.

3) Subtract the amount received by the class member from the Santa Fe settlement.

4) Add interest at the legal rate from July 2, 1965."

Order of October 23, 1978, at 9.

Plaintiffs assert that damages for this subclass should be computed using the average wages earned by a brakeman with sixteen to seventeen years of experience rather than being based on a brakeman with a seniority date of July 2, 1965. The trial court rejected that argument on the grounds that it would constitute an award retroactive to the Act. UTU attacks the use of the average brakeman's salary in the award formula, arguing that the inclusion of the freight brakeman salary in the average is improper because porters did not perform freight work. The district court included the salary of freight brakemen in the formula because

12. The Act limits an award of back pay by providing that no award may accrue more than two years before the filing of a claim with EEOC. Sears filed his claim with EEOC on October 4, 1966. Since no award may be made retroactive to the Act, Sears' filing date entitles him and other members of the class to an award accruing from the effective date. *See Teamsters*, 431 U.S. at 356–57, 97 S.Ct. at 1865.

"it would be difficult to determine at this late date what each subclass members [sic] would have done in terms of making bids for positions. The chain of events cannot be reconstructed. By using averages, those high-paying and low-pay positions will be combined.... We think these class members are entitled to presume that there would have been opportunities for them to bid their seniority the same as white brakemen with similar seniority."

Order of October 23, 1978, at 8.

 Under Title VII the trial court has wide discretion in fashioning remedies to make victims of discrimination whole. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975); *United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 949 (10th Cir. 1979). This Court will vary the district court award only when that court has abused its discretion. *Stone v. D. A. & S. Oil Well Servicing, Inc.*, 624 F.2d 142, 144 (10th Cir. 1980). Clearly back pay and seniority are suitable remedies well within the broad discretion of the trial court.

 Nevertheless, we hold the trial court was incorrect in its belief that to grant back pay as if the porters had pre-Act seniority would violate the Act. The remedy fashioned by the court should represent a reasonable attempt to restore the victims of discrimination to a position where they would have been absent the unlawful impact of the seniority system. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). If the court, in its attempt to carry out the "make whole" purposes of the act, assumes that a typical employee might have bid freight service as well as passenger service, we think it should also consider such an employee's typical length of service with Santa Fe in formulating an award. Such a formulation does not seem to us to constitute an award of seniority. An award of actual seniority is not an issue as to this subclass, because the last train porter working for the Santa Fe retired in 1975. Stipulation # 40. *See Teamsters*, 431 U.S. at 354–55, 97 S.Ct. at 1864–65. Recognition of

the length of service of the employees in this subclass would merely reflect the level of pay they would have received absent discrimination. Moreover, no fictional seniority is involved; these are employees of Santa Fe who have done braking work for many years. Alternatively, in this situation a way of making the discriminatees whole would be to limit the comparison to the wages of brakemen who performed only passenger work, as that is the work actually done by these porters. With this concept of equal pay for equal work, seniority would not be a factor.

Although we recognize most passenger train brakemen have considerable seniority, as did these porters, we will not dictate to the trial court which alternative to choose. The court of appeals' duty is to require a "consistent and principled application of the back pay provision, consonant with the twin statutory objectives [to eradicate discrimination and make sufferors whole], while at the same time recognizing that the trial court will often have the keener appreciation of those facts and circumstances peculiar to particular cases." *Id.* 422 U.S. at 421–22, 95 S.Ct. at 2373–74.

### B. *Chair Car Attendants*

The trial court limited relief to the chair car attendant subclass to awards of seniority, because Santa Fe settled monetary claims prior to trial and because it held UTU was not liable for post-Act discrimination. We have already found the union liable to this subclass. Under normal circumstances we would simply remand to the district court so that it might formulate a proper remedy. But it has already treated aspects of the remedy, considering seniority rights this subclass has against Santa Fe. Therefore, it seems appropriate to review the trial court's analysis on this issue and to provide guidance for the trial court.

In formulating back pay for the members of the chair car attendant subclass, different considerations apply than to the porter subclass. This is not a situation of equal pay for equal work; these individuals were not performing brakemen's duties on the effective date of Title VII. We think a proper back pay award against the union

might treat the individuals as new hires without previous seniority, from and after the date they did or would have applied to become brakemen.

In formulating remedies for post-Act discriminatory refusals to promote, the district court here divided the subclass of chair car attendants into two groups: those who applied for the position of brakeman and those who did not apply for that position. Order of October 23, 1978, at 10. In order to take advantage of the presumptions that he was able to perform the job functions of a brakeman and that a vacancy for a brakeman existed at the relevant time, the district court required each applicant to establish the date he applied for transfer or promotion and that he was physically qualified for the job. The proof required of each nonapplicant was that:

> "a) he would have applied for transfer or promotion, being willing to give up his February 7 [1966] Agreement protection and his chair car attendant seniority, and would have been willing to begin at the bottom of the brakeman seniority roster;
>
> b) the date he would have applied for transfer or promotion under these conditions; and
>
> c) that he was physically qualified for the job."

Order of October 23, 1978, at 16.

We agree that a nonapplicant should show when he would have applied. The *Teamsters* court said

> "To conclude that a person's failure to submit an application for a job does not inevitably and forever foreclose his entitlement to seniority relief under Title VII is a far cry, however, from holding that nonapplicants are always entitled to such relief. A nonapplicant must show that he was a potential victim of unlawful discrimination. Because he is necessarily claiming that he was deterred from applying for the job by the employer's discriminatory practices, his is the not always easy burden of proving that *he would have applied for the job had it not been for those practices*. When this burden is met, the nonapplicant is in a position analogous to that of an applicant and

is entitled to the [same] presumption . . . ."

431 U.S. at 367–68, 97 S.Ct. at 1870–71 (emphasis added).

We believe, however, that a member of the subclass who actually applied to become a brakeman should be allowed to show that he would have applied sooner (no earlier than July 2, 1965) had it not been for the unlawful discriminatory practices by defendants. To hold otherwise favors one who never challenged the system over one who, after delay, mustered the courage to make actual application.

Also, those who show they would have applied before February 7, 1966, should not be required to demonstrate they would have been willing to give up the job protection of the February 7 agreement. Until that time they had no protectable agreement right to give up. Also, as to those individuals, they should not be required to show they would have given up their chair car attendant's seniority. Until the February 7 agreement the chair car attendants had no collective bargaining agreement giving them seniority protection.

Affirmed in part, reversed in part. The case is remanded for further proceedings consistent with this opinion.

